**Willis E. CAMPBELL**

v.

**UNITED STATES PAROLE COMMIS-SION and Joseph S. Petrovsky.**

**Appeal of UNITED STATES PAROLE COMMISSION.**

No. 82–3294.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) Nov. 18, 1982.

Decided March 31, 1983.

Andrew D. Lyons, Lewisburg, Pa., for appellee.

David Dart Queen, U.S. Atty., David C. Shipman, Asst. U.S. Atty., Harrisburg, Pa., for appellant.

Before ALDISERT, SLOVITER and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### ISSUE

May the United States Parole Commission (Commission) consider, as an aggravating factor justifying a decision above the parole guidelines, a murder committed by the prisoner's two confederates which preceded a bank robbery in which all three participated? The district court disapproved of the parole decision made on that basis, and directed the Commission to hold a new parole hearing at which the murder could not be used as a reason for continuing the prisoner's custody. The Commission appeals and we reverse.

### FACTS [1]

In October 1972, following Willis Campbell's release on parole on August 4, 1972 from a six year sentence for burglary and grand larceny imposed in the District of Columbia Superior Court, he and two confederates arrived in Virginia Beach, Virginia for the purpose of robbing a bank. Lacking transportation, they hailed a taxicab, abducted the driver, and drove to a secluded area. While Campbell remained in the cab, his confederates removed the cab driver from the taxi, took him into a wooded area, and shot and killed him. Campbell asserts that he had no knowledge that a murder

would ensue, and has consistently disclaimed participation in or responsibility for the murder. After the other two returned to the taxi, the three proceeded to rob the bank, and shortly thereafter were arrested.

In January 1973, Campbell pleaded guilty to one count of bank robbery in the United States District Court for the Eastern District of Virginia, and was sentenced to 18 years imprisonment. He was also charged in Virginia state court with murder and abduction of the cab driver, and robbery of the bank customers. The murder charge was dismissed on motion of the prosecution. Campbell was convicted on the charge of abduction, for which he received a 20 year sentence, and on the charge of robbery of a bank customer, for which he received a 25 year sentence, both of which were to run concurrently with each other and with the federal sentence. Campbell's co-defendants were convicted in the state court on all three charges, including murder, and were sentenced to life imprisonment.

In August 1978, after Campbell had served 69 months of his federal sentence, he received his initial parole hearing at the penitentiary in Lewisburg, Pennsylvania in which he then was incarcerated. A divided panel determined not to set a parole date at that time, but to continue him for a four year reconsideration hearing in August 1982, the most severe decision available to the Commission at that time. The Notice of Action provided to Campbell explained the Commission's decision as follows:

> Your offense behavior has been rated as very high severity. You have a salient factor score of 2. You have been in custody a total of 69 months. Guidelines established by the Commission for adult cases which consider the above factors indicate a range of 60–72 months to be served before release for cases with good institutional program performance and adjustment. After review of all relevant factors and information presented, a decision above the guidelines at this consider-.

---

1. The "facts" are taken from the events as set forth in the record before us, consisting of the matters before the Commission and the district court.

ation appears warranted because prior incarceration and community supervision did not deter you from involvement in your serious instant offense behavior which involved a murder. As required by alw [sic], you have also been scheduled for a statutory interim hearing during August, 1980.

Campbell's statutory interim hearing was held in August 1980. The two hearing examiners disagreed. Examiner VanWalraven recommended that Campbell be paroled after serving 100 months; Examiner Alex recommended that he be denied parole and continued until the expiration of his term. Examiner VanWalraven noted that Campbell's presentence report did not mention the cab driver's murder, that Campbell still faced a substantial period of time on the Virginia sentence, and that parole after 100 months would be 28 months above the guidelines and "appears to be the appropriate amount of time for accountability and his role in the instant offense." Examiner Alex, on the other hand, stated it was "immaterial that the file does not contain information to the effect that the cab driver in the subject's offense was shot and killed, inasmuch as he himself admits that this took place"; that "the total offense behavior clearly involved a cold blooded murder" and that Campbell was admittedly on the scene; that Virginia might not require him to serve much additional time; and that because Campbell's salient factor score was only 2 and he had "what actually amounts to a Greatest II offense severity situation", he should be continued until expiration of his term "even in view of his relatively good prior record." Since the two hearing examiners were divided, the Administrative Hearing Examiner cast the deciding vote, agreeing with Examiner Alex. *See* 28 C.F.R. § 2.23(c) (1982).

The Notice of Action informed Campbell of the Commission's decision to continue him in prison until expiration of his term. It explained the decision as follows:

Your offense behavior has been rated as very high severity because it has previously been rated in this category, despite it being a bank robbery involving a murder. You have a salient factor score of 2. You have been in custody a total of 94 months. Guidelines established by the Commission for adult cases which consider the above factors indicate a range of 60–72 months to be served before release for cases with good institutional program performance and adjustment. After review of all relevant factors and information presented, *a decision above the guidelines appears warranted because your offense behavior involved the following aggravating factors: the cab driver was taken into the woods and shot to death.*

(emphasis added). This decision was affirmed on administrative appeal.

After exhausting his administrative remedies, Campbell filed this habeas corpus petition under 28 U.S.C. § 2241 in the United States District Court for the Middle District of Pennsylvania alleging, *inter alia,* that the Commission abused its discretion by determining that he was involved in a murder when the facts did not support such a determination. The district court agreed, holding: "The record before the Parole Commission was devoid of any factual basis for examiner Alex's conclusion that Campbell's total offense behavior involved a cold blooded murder, or for the Commission's decision that the cab driver's death was an aggravating factor justifying a parole decision six years above the guidelines." The court commented that "[s]ome decision above the guidelines may have been warranted in this case" in view of "the short period between petitioner's parole in the District of Columbia and the commission of the offense for which he is now incarcerated", but concluded that "petitioner has already served time considerably beyond his guideline range."

The district court ordered the Commission to hold a new parole hearing for Campbell at which it could "not use the fact of the cab driver's murder as a reason for continuing petitioner's custody." The Commission appealed, but in the interim complied with the court's order and held the new hearing. On July 8, 1982, the Commis-

sion notified Campbell by Notice of Action of its decision to parole him effective August 17, 1982 to his detainer held by Virginia on the state charges, or, if the detainer were not exercised, to parole him directly to the community effective October 17, 1982 with special drug aftercare and special supervision during the first six months. The new Notice of Action did not refer to the murder of the cab driver, but gave as an aggravating factor warranting a decision above the guidelines the fact that "[t]he new crime [the robbery], much more serious than the crime from which [Campbell was] paroled, occurred only two months after release" from the District of Columbia sentence. The Notice explained that the parole decision was made to comply with the court order and "was not the result of an independent exercise of [the Commission's] discretion ... under its usual practices." The Commission reserved the right to void its new decision if the district court's order should be reversed or vacated on appeal.[2]

On appeal, the Commission argues that the district court improperly substituted its judgment for that of the Commission and erred in holding that the Commission could not consider the murder of the cab driver as part of Campbell's offense behavior in making its parole determination.

2. The Commission represents that if its original determination to continue Campbell until expiration of his term had been upheld by the district court, Campbell, after allowance for good time credits, would have been required to remain in custody 136 months, or until February 1984, instead of being released pursuant to the redetermination ordered by the district court. Therefore, the Commission's compliance with the district court's order does not render this appeal moot, since the effect of our reversal of the district court is to permit the Commission to return Campbell to custody. See Gill v. Garrison, 675 F.2d 599, 600–01 (4th Cir.1982); see also Eagles v. United States ex rel. Samuels, 329 U.S. 304, 306–08, 67 S.Ct. 313, 315–316, 91 L.Ed. 308 (1946); cf. United States v. Ferri, 686 F.2d 147, 157 n. 14 (3d Cir.1982) (Commission's appeal not moot simply because it had already complied with district court order).

3. The applicable statute, 18 U.S.C. § 4207 (1976), provides:

In making a determination under this chapter (relating to release on parole) the Com-

*DISCUSSION*

*1. Was there any factual basis for concluding that Campbell's offense behavior included a murder?*

We view the district court's order requiring the Commission to hold a new parole hearing as presenting two issues: whether the record before the Commission was devoid of any factual basis for the conclusion that Campbell's total offense behavior involved a cold blooded murder and whether the Commission could consider that the cab driver's death was an aggravating factor justifying a parole decision for Campbell six years above the guidelines. We will consider these questions in turn.

Patently, the Commission may not base its judgment as to parole on an inaccurate factual predicate. *Kohlman v. Norton,* 380 F.Supp. 1073, 1074–75 (D.Conn.1974); see *Solomon v. Elsea,* 676 F.2d 282, 287–89 (7th Cir.1982) (per curiam). In ascertaining the facts, however, the Commission may take into consideration a broad range of information, including "such ... relevant information concerning the prisoner ... as may be reasonably available."[3] This court

mission shall consider, if available and relevant:

(1) reports and recommendations which the staff of the facility in which such prisoner is confined may make;

(2) official reports of the prisoner's prior criminal record, including a report or record of earlier probation and parole experiences;

(3) presentence investigation reports;

(4) recommendations regarding the prisoner's parole made at the time of sentencing by the sentencing judge; and

(5) reports of physical, mental, or psychiatric examination of the offender. There shall also be taken into consideration such additional relevant information concerning the prisoner (including information submitted by the prisoner) as may be reasonably available.

We know of no authority to support the dissent's suggestion that the Commission must disregard relevant evidence of a state offense for which there is an adequate factual basis merely because the state has chosen not to press the particular charge. The dissent's claim that our holding implicates the doctrine

has held that the Commission may consider hearsay, *Zannino v. Arnold,* 531 F.2d 687, 692 (3d Cir.1976); counts of an indictment which have been dismissed, *United States ex rel. Goldberg v. Warden,* 622 F.2d 60 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980); and information in a separate dismissed indictment, *Arias v. United States Parole Commission,* 648 F.2d 196, 199–200 (3d Cir.1981). Our inquiry in reviewing a Parole Commission decision "is only whether there is a rational basis in the record for the Board's conclusions embodied in its statement of reasons." *Zannino v. Arnold,* 531 F.2d at 691.

■ The 1980 Notice of Action identified only one aggravating factor justifying a decision above the guidelines, *i.e.* "the cab driver was taken into the woods and shot to death." The Commission had before it a 1973 "Classification Summary" on Campbell prepared by the Bureau of Prisons; a 1978 progress report; a 1972 memorandum prepared for the District of Columbia Board of Parole; Campbell's presentence report; the 1978 parole hearing summary; the testimony of his case manager; Campbell's version of the facts; and, on administrative appeal, a letter solicited by Campbell from the Virginia state prosecutor. This material is replete with references to the events surrounding the murder of the cab driver. For example, the 1972 District of Columbia parole memorandum stated in part that "[t]he Cabdriver was subsequently taken to a wooded area where he was shot and killed by [his confederates], while the Subject waited in the taxi-cab." The letter from the Virginia state prosecutor, relied on by Campbell, recounts the event in similar fashion. The 1973 Classification Summary reciting Campbell's version of the facts evinces his admission that the murder took place and concedes his role in the abduction and robbery of the cab driver. Although Campbell argues, and the district court emphasized, that the presentence report did not mention the murder of the cab driver, we see no significance in that fact. It

appears undisputed that Campbell arrived in Virginia Beach for the purpose of robbing the bank, that he participated in the abduction of the cab driver, that he waited in the cab while his two confederates committed the murder, and that after his confederates returned to the cab, he participated in the bank robbery using the cab.

Campbell vigorously asserts that "the facts in this case clearly establish that [he] did not know what his co-defendants were doing, did not participate in the murder, and had no knowledge of the same." Brief for Appellee at 3. These "facts" are not "clearly establish[ed]." Campbell relies on the letter dated September 29, 1980 from the Virginia prosecuting attorney which was written in response to Campbell's letters seeking clarification of the charges for which he was prosecuted in Virginia. This letter does not "establish" that Campbell had no prior knowledge of the murder. It states, in relevant part:

> Originally, all three of you were charged with a number of offenses, robbery, abduction, murder, etc. The other two were convicted of these offenses. The murder charges against you were dismissed on motion of the Commonwealth for several reasons. *While it would have been reasonable to suppose that you knew that Moye and Hudson were taking the cab driver into the woods at gunpoint,* nevertheless, you testified that you did not know what they were going to do, and there was *no evidence that you actually participated in the murder.* Furthermore, you cooperated with the State in the prosecution of the other two.

(emphasis added). At most, this letter indicates that Campbell did not physically participate in the murder and that his prior knowledge thereof was never proven at trial. The Commission's decision does not rest on a finding that Campbell had actual knowledge of the murder or participated therein. Rather, in stating that Campbell's "offense behavior involved the following aggravating factors: the cab driver was

---

of federalism is extravagant, since the Parole Commission action has not interfered, directly or indirectly, with any state criminal proceeding.

taken into the woods and shot to death," the Commission was referring to the undisputed fact that a murder was committed in connection with the robbery. Thus, the district court erred in holding that the Parole Commission's conclusion was "devoid of any factual basis."

*2. Could the Commission properly consider the cab driver's death as an aggravating factor?*

■ Having established the factual predicate for the Parole Commission's decision, we must next decide whether the Commission could consider the cab driver's death as an aggravating factor justifying a parole decision six years above the guidelines. Parole guidelines were originally issued in 1973 by the Commission's predecessor, the Parole Board, in an effort to provide a scientific and objective means of structuring and institutionalizing discretion in parole release decisionmaking and in an attempt to minimize the effects of sentencing disparities. Note, *Parole Release Decisionmaking and the Sentencing Process*, 84 Yale L.J. 810, 822–23 (1975) [cited as Yale Note]. The use of guidelines was given statutory approval in 1976 when Congress enacted the Parole Commission and Reorganization Act, Pub.L. No. 94–233, 90 Stat. 219, 18 U.S.C. §§ 4201 et seq. (1976). That statute, which established the newly constituted United States Parole Commission as an independent federal agency, requires the Commission to "promulgate rules and regulations establishing guidelines" for the purpose of carrying out the parole decisionmaking power entrusted to it. 18 U.S.C. § 4203(a)(1) (1976).

The guidelines consist of a table or grid formed by two indices, one for the severity of the offense and the other for the parole prognosis of the prisoner based on what is denominated as the "salient factor score." *See* 28 C.F.R. § 2.20 (1982). Offense severity is categorized as low, low moderate, moderate, high, very high, greatest I, or greatest II. Salient factor scores currently range from 0 (worst) to 10 (best) and measure factors such as prior convictions, prior parole history, drug dependence and age at the time of the offense. An inmate is scored along each index and the time range at the point at which the two indices meet is the guideline for parole for that prisoner. Campbell's offense (robbery) was rated "very high", he was given a salient factor score of 2, and his guideline range was 60–72 months. The Commission's decision in this case was to keep Campbell in custody until expiration of his sentence, or approximately 136 months.

Although the Commission must, in the first instance, use the guidelines in determining the release of a prisoner, 18 U.S.C. § 4206(a) (1976),[4] it is not limited by them. The statute expressly authorizes parole decisions outside the guidelines where "good cause" is determined to exist. 18 U.S.C. § 4206(c) (1976). Congress recognized that the definition of "good cause" "can not be a precise one, because it must be broad enough to cover many circumstances." H.R.Rep. No. 838, 94th Cong., 2d Sess. 27, *reprinted* in 1976 U.S.Code Cong. & Ad. News 351, 359.[5] The guidelines them-

---

**4.** Section 4206(a) provides:

(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare;

subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursu-

ant to section 4203(a)(1), such prisoner shall be released.

**5.** The Conference Report gives the following examples as bases for parole decisions above the guidelines:

For example, in making a parole release determination above the guidelines, the Commission would consider factors which include whether or not the prisoner was involved in an offense with an unusual degree of sophistication or planning, or has a lengthy prior record, or was part of a large scale conspiracy or continuing criminal enterprise.

selves provide that "[t]hese time ranges are merely guidelines. Where the circumstances warrant, decisions outside of the guidelines (either above or below) may be rendered." 28 C.F.R. § 2.20(c) (1982). Aggravating circumstances may warrant a decision above the guidelines; mitigating circumstances may warrant a decision below the guidelines. *Id.* § 2.20(d).

Implicitly, the factors which should be considered aggravating or mitigating are not readily incorporable in the guideline categories or they would have been included in the guidelines themselves. Instead, they depend on the circumstances of the individual case. In this case, it was not unreasonable for the Commission to have concluded it was appropriate to hold Campbell accountable for purposes of parole for the murder of the cab driver. He participated in the abduction of the cab driver; that abduction was in furtherance of the bank robbery; he watched his confederates march the cab driver into the woods at gun point; and he does not suggest that he made any effort to deter any subsequent harm to the driver. Accordingly, we reject Campbell's claim that the Commission deviated from its Guideline Application Manual. Under the procedure set forth there, a prisoner may be held accountable for actions committed by associates which he could have controlled or about which he should have known.[6]

Strikingly similar circumstances were considered by the court in *McArthur v. United States Board of Parole,* 434 F.Supp. 163 (S.D.Ind.1976), *aff'd mem.,* 559 F.2d 1226 (7th Cir.1977), where a prisoner challenged a parole decision to classify him on the basis of a crime committed by his confederates. In that case the Parole Board held that the offense severity rating of the prisoner, who was convicted of bank robbery and conspiracy to commit armed rob-

bery, should be increased "because the offense included kidnapping" occurring when three of his confederates commandeered a cab, locked the cab driver in the trunk, and left him there when the vehicle was abandoned. The court stated:

> Thus, the only question is whether the board acted "rationally" in holding Petitioner responsible for the kidnapping, whether or not he was charged with that offense. The simple fact is that the Petitioner must bear responsibility, both under the criminal law and before the board of parole, for actions of his confederates in furtherance of their conspiracy. This is not simply an issue of vicarious liability. The scheme disclosed by the record is a particularly heinous one, involving a total disregard for human life. Petitioner and his confederates were certainly prepared to do whatever was necessary to effectuate their purpose. In this case, it became "necessary" for certain members of the conspiracy to abduct a cab and its driver, and to later abandon the cab, leaving the driver helpless and in peril of his life. Petitioner cannot escape responsibility by hiding his head in the sand and blaming others. He was a full participating member of the conspiracy and shared in its gains. The Board of Parole could justly conclude that one who participated in such a scheme is of particular concern to society.

434 F.Supp. at 166–67. We find Campbell's attempt to distinguish *McArthur* unpersuasive. In this case there may be even more reason to hold Campbell responsible for the acts of his confederates than in *McArthur* since he was on the scene when the cab driver was led to his murder while in *McArthur* the prisoner was apparently not present at the kidnapping. It was thus not arbitrary for the Commission to consider the cab driver's murder as an aggravating factor.

---

H.R.Rep. No. 838, 94th Cong., 2d Sess. 27, *reprinted* in 1976 U.S.Code Cong. & Ad.News 351, 359.

**6.** The Manual states:
The prisoner is to be held accountable for his own actions and actions done in concert with others; however, the prisoner is not to

be held accountable for activities committed by associates (over which the prisoner had no control or could not be reasonably expected to know about).
United States Parole Commission Guideline Application Manual III.E. (1982).

Campbell also argues that if it was proper for the Commission to take the murder into account, it should have been used in determining his offense severity rating, rather than as an aggravating factor. He relies on the holding in *Brach v. Nelson,* 472 F.Supp. 569 (D.Conn.1979), that the Commission could not properly use the same factor in scoring a prisoner pursuant to the guidelines and as an aggravating factor justifying a decision above the guidelines. That issue is not presented here because there is no suggestion that the murder was used by the Commission in determining Campbell's offense behavior.[7] Campbell was placed in the "very high" category because of his involvement in the bank robbery. Murder is included among the offenses categorized as "Greatest II" offense behavior. Had murder been used in scoring Campbell's offense, his guideline, when combined with his salient factor score of 2, would have been 100 + months, with no upper limit. Therefore, treatment of the murder as an aggravating factor rather than in determining the offense severity did not inure to his prejudice. *Compare Hearn v. Nelson,* 496 F.Supp. 1111, 1115–16 (D.Conn.1980) (Commission cannot increase prisoner's incarceration time by using factor as aggravating rather than using it to score offense severity).

*3. Was the Commission obliged to find mitigating factors?*

█ Finally, Campbell complains that the Commission abused its discretion by failing to consider mitigating factors. He argues that the Commission gave no weight to the fact that he has made an "excellent institutional adjustment", has had no disciplinary problems while incarcerated at Lewisburg, has participated in educational and vocational programs, has overcome his drug dependence, and has in general improved his maturity and socialization levels. He also notes he faces a substantial sentence in Virginia, a factor which may be considered as mitigating under the Commission's

Guideline Application Manual. *See* Guideline Application Manual at V.B. 10. It is apparent from the record that these factors were not ignored. The hearing summary referred to Campbell's good record and self improvement; Examiner Alex noted that he reached his decision to continue Campbell to expiration "even in view of his relatively good prior record"; and both hearing examiners referred to the Virginia sentence.

Campbell also contends that the Commission failed to consider that he had cooperated with Virginia authorities in the prosecution of his co-defendants. While neither the hearing summary nor the Notice of Action refers to this fact, the Commission is not *obliged* to reward such cooperation. The Guideline Application Manual cited by Campbell indicates that the Commission *may* consider cooperation as a mitigating factor if the "prisoner has provided substantial cooperation to the government . . . *which has been otherwise unrewarded.*" Guideline Application Manual at V.; V.B. 8. (emphasis added). Contrary to Campbell's claim, his cooperation has not gone unrewarded, since the same letter from the Virginia prosecutor upon which Campbell relies for the fact that he cooperated with the authorities also states that his cooperation was one of the bases for the dropping of the state murder charge against him.

In sum, Campbell's claim that the Commission ignored mitigating factors is not supported by the record. The weight to be accorded such factors is clearly entrusted to the discretion of the Commission. *See Solomon v. Elsea,* 676 F.2d at 289–91. The legislative history of the statute makes that explicit. H.R.Rep. No. 838, 94th Cong., 2d Sess. 28, *reprinted in* 1976 U.S.Code Cong. & Ad.News 351, 360 (the weight to be given the various items of information before the Commission "is solely within the province of [its] broad discretion").

---

**7.** In *Solomon v. Elsea,* 676 F.2d 282, 286–87 (7th Cir.1982) (per curiam), the court held that even though the quantity of hashish possessed determined the offense severity category, possession of an amount 1,000 pounds greater than the largest amount in the offense severity range could serve as "good cause" for a decision above the guidelines.

We view the district court's decision to require the Parole Commission to reconsider Campbell's parole eligibility without reference to the murder as an unjustified interference with the Commission's discretion in the exercise of its parole decisionmaking. Congress has made the judgment that the Commission and not the courts should determine the release time of prisoners within the parameters set by the courts under the sentencing statutes.[8] While there are commentators who believe that parole decisions as well as sentences should be made by judges since the majority of the factors utilized by the guidelines are based on evidence available to the sentencing judge, *see* Yale Note at 848, Congress chose to vest in the Commission the sole discretion for granting or denying parole. The Commission's guidelines reflect the exercise of this administrative discretion and the Commission is not bound to adhere to them inexorably. The Conference Committee considering the Parole Commission and Reorganization Act made explicit that the Commission could deviate from the guidelines for reasons "which are not arbitrary, irrational, unreasonable, irrelevant or capricious." H.R.Rep. No. 838, 94th Cong., 2d Sess. 27, *reprinted in* 1976 U.S.Code Cong. & Ad. News 351, 359. The decision to continue Campbell in prison until expiration of his term was severe, but under the circumstances of this case we believe that a court could not term that decision arbitrary, irrational, unreasonable, irrelevant or capricious.

For the foregoing reasons we will reverse the order of the district court.

ROSENN, Circuit Judge, dissenting.

The majority reverses the district court, holding that the United States Parole Commission acted lawfully in deciding to continue Campbell's incarceration six years beyond the guideline period because of the murder committed by Campbell's confederates preceding the bank robbery. The Federal Parole Commission took this action notwithstanding the Virginia authorities' considered decision to dismiss on motion of the Commonwealth the state murder charge against Campbell, and even though Campbell may yet serve lengthy state sentences for his role in the bank robbery and the abduction of the taxi cab driver. I am constrained to disagree with the majority's approval of the Commission's disposition on two accounts. In my opinion, by punishing[1] Campbell for the crime of murder which the Commonwealth of Virginia declined to prosecute, the Federal Parole

---

8. The trial court may impose a sentence with a maximum term under which the prisoner is eligible for parole only after service of one third of the sentence, 18 U.S.C. § 4205(a) (1976); may set a point of parole eligibility before one third of the sentence has been served, 18 U.S.C. § 4205(b)(1) (1976); or may impose a sentence under which the prisoner is eligible for parole at any time, 18 U.S.C. § 4205(b)(2) (1976).

1. The Federal Parole Commission's decision to impose upon Campbell a substantial additional period of incarceration on account of the murder may properly be described as a decision to "punish" Campbell for the murder. I would reject any suggestion that the decision to continue Campbell's incarceration reflects nothing more than the Parole Commission's professional judgment that Campbell has not yet been fully rehabilitated. Rehabilitative or reformative theories of incarceration, so popular a decade or two ago, have come under widespread attack. *See* Alschuler, *Sentencing Reform and Prosecutorial Power: A Critique of Recent Proposals for "Fixed" and "Presumptive" Sentencing,* 126 U.Pa.L.Rev. 550, 552 (1978). The

United States Parole Board itself has explicitly acknowledged that it cannot divine the "magic moment" at which an offender has "reformed" and schedule his release accordingly. *See* Alschuler, *Sentencing Reform and Parole Release Guidelines,* 51 U.Colo.L.Rev. 237, 238 (1980) (citing Coffee, *The Repressed Issues of Sentencing: Accountability, Predictability, and Equality in the Era of the Sentencing Commission,* 66 Geo.L.J. 975, 990 (1978)). Its regulations now cite retribution as a factor to be considered in the parole decision making process. 18 U.S.C. § 4206(a). *See* Note, *The Parole Commission and Reorganization Act: The Impact of Parole Guidelines on the Federal Youth Corrections Program and Indeterminate Sentencing,* 37 Rutgers L.Rev. 491, 491 (1982). The Parole Commission's statement in its letter to Campbell to the effect that Campbell would not be paroled now because that would depreciate the seriousness of his offense, supports the contention that Campbell's incarceration was extended substantially for retributive purposes.

Commission has both deprived Campbell of his sixth and fourteenth amendment rights,[2] and invaded a prosecutorial arena traditionally reserved to the states, thereby deliberately disregarding the spirit of Our Federalism.

I believe that in the instant case the Parole Commission erred by considering the murder, a factor which in all fairness it had no right to consider. The state of Virginia did not convict or even prosecute Campbell for the murder; it nolle prossed the charge. It restricted its prosecution to the bank robbery and kidnapping charges. In a letter to Campbell dated September 29, 1980, the Commonwealth's attorney wrote that the State had dismissed the murder charge on its own motion because Campbell had not carried a gun, had not participated in the actual murder, claimed that he did not know that there would be a murder, and because Campbell had cooperated with the Commonwealth by testifying against his confederates.

By imposing upon Campbell a term of incarceration for a crime for which he was never prosecuted, the federal parole commission has acted in a fundamentally unfair manner inconsistent with our system of criminal justice. In an indirect but highly effective fashion, it has stripped Campbell of his sixth amendment right to a fair trial on the murder charge, a right made obligatory upon the states by the fourteenth amendment. There is nothing in the record to indicate that Campbell pled guilty to the charge or made any agreement with the Virginia prosecutor. On the contrary, the record indicates that the Commonwealth

dismissed the murder charge of its own accord. Campbell did not know what had become of the murder charge, and had to write to the prosecutor's office in order to find out. Presumably, if Campbell's attorney had entered into a formal plea bargain with the Commonwealth's attorney, Campbell would have been asked to plead guilty to some charge and would have been consulted concerning the waiver of his constitutional right to defend himself at trial.[3] But Campbell was never consulted.

If Campbell had been tried for the murder and acquitted, the Federal Parole Commission would of course have been prohibited from considering the murder in connection with Campbell's parole hearing. *See* Department of Justice Regulations, 28 C.F.R. § 2.19(c). Under the circumstances it seems particularly unfair and ironic that the Parole Commission should be allowed to hold Campbell responsible for the murder precisely because the Virginia authorities, perhaps believing that the murder charge would be too difficult to prosecute, or for some other good reason, decided not to pursue it.

The instant case is clearly distinguishable from those federal cases in which a criminal defendant, pursuant to a plea bargain, pleaded guilty to a charge that did not reflect the true gravity of his offense and subsequently was denied early parole because his parole board considered the actual facts of his crime. *See Arias v. United States Parole Commission,* 648 F.2d 196 (3d Cir.1981); *United States ex rel. Goldberg v. Warden, Allenwood Federal Prison Camp,* 622 F.2d 60 (3d Cir.), *cert. denied,* 449 U.S.

**2.** This is not a procedural due process matter, but rather a case involving questions of substantive due process and federalism. Therefore, the Supreme Court's opinion in *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), describing the procedural protections due to persons seeking parole release, does not apply here. As this court observed in *Block v. Potter,* 631 F.2d 233 (3d Cir.1980), *Greenholtz* does not authorize a governmental entity (in that case a state) which has established a parole program to operate that system in an arbitrary and capricious fashion. Quoting from *Perry v. Sindermann,* 408

U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), *Block* held that " 'even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.' " 631 F.2d at 235–36.

**3.** The decision to plead "guilty" or "not guilty" is a decision reserved solely for the accused based on his intelligent and voluntary choice. *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980). In such plea bargain cases, an accused consciously decides that the risk of conviction for the most serious crime with which he is charged is sufficiently great to justify renunciation of his sixth amendment rights—and any possibility that he will be found innocent—in exchange for the certainty of a conviction on a lesser charge. In the instant situation, Campbell made no conscious choice. Had Campbell known that he was to be punished for murder, he could have exercised his sixth amendment right to trial by jury. Thus, the Parole Commission has essentially made a factual determination of guilt for a state crime, effectively denying Campbell his right to present his case to a jury. The requirement of proof beyond a reasonable doubt and the usual trial safeguards have been arbitrarily discarded by bureaucratic fiat. *See generally* Alschuler, *Sentencing Reform and Parole Release Guidelines,* 51 U.Colo.L.Rev. 237, 242 (1980).

This brings me to my second concern. I believe that the Federal Parole Commission was without authority to punish Campbell for the murder after Virginia had declined to do so. In deliberately disregarding the State's action with respect to the murder charge, the Federal Parole Commission, concerned as it is with the federal offense of bank robbery, has intruded into a matter that is the specific concern of the Commonwealth of Virginia.

The United States Supreme Court has long recognized the rights of the states to administer their own laws—and particularly their criminal laws—without undue federal intrusion. For the most part, the Supreme Court has held that federal authorities should interfere with state administration of justice only to the extent such interference is constitutionally mandated. As the Court admonished in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1973), we must always be mindful to sustain the " 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.' " *Id.* at 500, 94 S.Ct. at 678 (quoting *Stefanelli v. Minard,* 342 U.S. 117,

120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951)). More specifically, in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that the federal courts should not, absent exceptional circumstances, enjoin a criminal proceeding in state court. The *Younger* holding is grounded not only in fundamental doctrines of equity jurisprudence, but also in a concept which the Court characterized as "Our Federalism." As Justice Black, writing for the *Younger* Court, observed:

[The] underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as "Our Federalism," and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of "Our Federalism." . . . It should never be forgotten that this slogan, "Our Federalism," born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future.

*Id.* at 44–45, 91 S.Ct. at 750–751.

If "Our Federalism" prohibits the federal courts from interfering with the administration of state justice by enjoining prosecutions in state courts, surely federal parole commissions have no greater claim to absolution from this doctrine. I believe that indiscriminate intrusions by a federal administrative agency into the exercise of state prosecutorial discretion are precluded by the policy of federalism. Such intrusions can be humiliating to the state, disruptive of its prosecutorial plan and obligations, and heedless of the historic belief that

our national interests are best served if the States are permitted to perform their governmental functions in accordance with their distinctive requirements. Federal officials should not be allowed to interfere arbitrarily with a state's administration of justice by affirmatively mandating the enforcement of a state criminal statute. But this is essentially what the Parole Commission has done by withholding Campbell's parole because of a crime for which the Virginia authorities declined to prosecute him.

In closing, I note that it makes no difference here whether a federal action complained of runs directly against the state courts or whether it runs against some other unit of state or local government such as the office of the Commonwealth's prosecuting attorney. In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1975), the Supreme Court applied the doctrine of *Younger v. Harris* to prevent federal interference with the Philadelphia police department. In so doing the Court observed that the federal courts were not free to limit the department's freedom to conduct its own affairs. *Id.* at 379, 96 S.Ct. at 608. Under the rationale of *Rizzo v. Goode,* the Parole Commission's intrusion upon the exercise of discretion by Virginia to administer its laws is also contrary to the spirit of "Our Federalism."

In summary, I dissent because I believe the United States Parole Commission deprived Campbell of his sixth and fourteenth amendment rights and impermissibly trespassed upon the prerogative of the Commonwealth of Virginia to nolle prosse the murder charge. I would therefore affirm the judgment of the district court.