**UNITED STATES of America**

v.

**David FRIEDLAND, Defendant.**

**David FRIEDLAND, Petitioner,**

v.

**Douglas LANSING, Warden, United States Federal Correctional Institution—Fort Dix, and United States Parole Commission, Respondents.**

**David FRIEDLAND, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

Crim. No. 85–332.
Civ. Nos. 94–4463 (JEI), 94–4464 (JEI).

United States District Court, D. New Jersey.

March 2, 1995.

Brian W. Shaughnessy, Shaugnessy, Borowski & Gagner, Washington, DC, Robert H. Jaffe, Jaffe & Associates, Springfield, NJ, for petitioner.

Jeremy D. Frey, Office of the U.S. Atty., Camden, NJ, Sharon Gervasoni, U.S. Parole Com'n, Chevy Chase, MD, for respondents.

IRENAS, District Judge:

David Friedland has moved for reconsideration of his sentence pursuant to Fed. R.Crim.P. Rule 35(b) and has also petitioned the court for a writ of Habeas Corpus pursuant to 28 U.S.C. § 2255 and 28 U.S.C. § 2241. Friedland argues that (i) the government failed to honor a commitment to move for a reduced sentence based on his substantial cooperation in pursuing other criminal investigations and (ii) the United States Parole Commission ("Commission") extended his incarceration beyond the date allowed by the parole guidelines contained in 28 C.F.R. § 2.20. Because the decision of the government not to move for a sentence reduction and the decision of the Commission to exceed the parole guidelines were proper exercises of discretionary power the motion and petitions will be denied.

## I. BACKGROUND

### A. Friedland I

In 1980 David Friedland ("Friedland"), a New Jersey State Senator and an attorney for Teamsters Local 701 Pension Fund ("Pension Fund"), was convicted in the New Jersey District Court of receiving over $300,-000 in "kickbacks" related to the Pension Fund, filing false income tax statements, and obstruction of justice. He was sentenced to seven years in federal prison ("Friedland I").

Friedland never began service of his sentence. Instead, he entered into a cooperation agreement with the United States Attorney's Office for the District of New Jersey.

### B. The Omni scheme

Between 1982 and 1985, while cooperating with the government, Friedland entered into another scheme to siphon off Pension Fund assets. According to the presentence report Friedland conspired to defraud the Pension Fund by (i) investing twenty million of its money with Omni Funding Group, Inc., ("Omni") a Florida mortgage broker firm and (ii) arranging for kickbacks of profits made on that investment. Omni made non-insurable, high risk investments, notwithstanding that the contract between Omni and the Pension Fund prohibited such activity. In 1984 Friedland began liquidating Omni and moving his money into offshore accounts in the Bahamas held by the Corniche and Scorpio Corporations, both of which he controlled. Approximately $1,200,000 of Omni's profits were wired to these accounts on Friedland's behalf. Friedland also split approximately $400,000 in cash and $600,000 in gold coins with Joseph J. Higgins, a co-conspirator in the Omni scheme.

In September of 1985, when Friedland learned that he was going to be indicted for the Omni scheme, he travelled to the Bahamas where he faked his own death. He was thereafter indicted again and became a fugitive. For two and one-half years Friedland lived in Europe, Africa, and Asia. He was

captured in 1988 in the Maldive Islands, off the coast of India, and was returned to the United States.

## C. *Friedland II*

Friedland's trial on the Omni related indictment started on September 28, 1988, and on the next day he pled guilty to conspiring to solicit and receive kickbacks under RICO, travelling with the intent to promote and facilitate bribery, endeavoring to influence a grand jury, and falsifying income tax returns (Friedland II). On December 2, 1988, Friedland was sentenced by Judge John F. Gerry, as a pre-Sentencing Guidelines offender, to serve an aggregate sentence of fifteen years, eleven months and six days to run concurrently with the sentence imposed in Friedland I. Judge Gerry also imposed a $25,000 fine. Friedland was incarcerated in the Federal Correctional Institute ("FCI") at Raybrook, New York. Subsequently, he was transferred to FCI Petersburg, Virginia and then to FCI Fort Dix, New Jersey, where he is presently an inmate.

On March 30, 1989, Friedland filed a timely motion for reduction of sentence under Fed.R.Crim.P. 35(b), claiming that the court had imposed an excessive sentence and offering additional evidence in mitigation of that sentence. Judge Gerry denied this motion on May 24, 1989.

## D. *The Program*

While in prison Friedland developed a "program" to persuade other prisoners to supply him with information relating to illegal drug activities—information which he hoped to exchange for a government motion to reduce his sentence. However, Michael Chertoff, then the United States Attorney for the District of New Jersey, did not consider Friedland's "brokering" of information to be an appropriate basis for reducing his sentence. Having been frustrated in his attempt to procure a reduction of sentence for this information, Friedland looked for other outlets.

In the summer of 1990, Friedland contacted Special Agent Longarzo of the Drug Enforcement Administration, told him about the program, and indicated he had information relating to the importation of narcotics. According to Friedland, Longarzo promised that the sentencing court and the Commission would be apprised of the nature and scope of any assistance provided and that he would recommend that Friedland be granted a reduction in sentence.

Thereafter, Friedland relayed information to Longarzo from a confidential informant referred to as "Hajib," which resulted in the interception of five kilograms of heroin at Kennedy Airport and the prosecution of one individual. Hajib later directly provided additional information which resulted in additional seizures and the arrest of six more people. Friedland also provided the name of a second individual, referred to as "Hajib II," whose information resulted in the arrest of three other people in 1991. At this point, according to Friedland, Longarzo again promised that the sentencing court and the Commission would be apprised of the nature and scope of any assistance provided and that he would recommend that Friedland be granted a reduction in sentence despite any opposition from the United States Attorney in New Jersey.

Longarzo then approached the office of the United States Attorney for the Eastern District of New York, and the matter was assigned to Assistant United States Attorney ("AUSA") Patricia Notopoulos. Friedland's attorney, Brian Shaughnessy, met with Notopoulos and told her that Friedland wanted to cooperate with the government. In return Friedland wanted the United States Attorney's Office to advise the sentencing court of his cooperation, but he was concerned that Chertoff would frustrate this effort. According to Shaughnessy, Notopoulos told him that, if Friedland continued to cooperate, her office would inform the court of Friedland's cooperation regardless of Chertoff's intervention. However, Friedland declined at this point to render further assistance to the authorities.

Notopoulos advised Chertoff in a letter dated March 7, 1993, that she personally had informed Friedland that (i) no promises were being made to him but (ii) she would relay the information he provided to the District of

New Jersey, where it would be decided whether he would receive any benefit from the program. On March 9, 1993, Chertoff wrote to Friedland's attorney advising him that the he would not recommend that Friedland's sentence be reduced. He considered the information brokered and did not wish to create a secondary market in the benefits of cooperation.

### E. *The Parole Hearing*

On March 10, 1993, Friedland attended an initial parole hearing before a Hearing Examiner Panel of the Commission at FCI Petersburg. Friedland was represented by his attorney, Brian Shaughnessy, and Paul Kurtz, Executive Director of the National Correctional Counselling Center. The Deputy Chief of the Special Prosecution Division of the United States Attorney for the District of New Jersey, and a Special Agent from the Department of Labor also attended the meeting and opposed Friedland's request for parole. The members of the Hearing Examiner Panel referred Friedland's case to the Regional Commissioner for an original jurisdiction decision and provided an alternate recommendation that he serve 84 months with a special financial disclosure provision.

On April 19, 1993, the Commission issued a notice of action in which it ordered that Friedland continue his sentence to expiration with the special financial disclosure condition. The Commission stated in its decision:

> Your offense behavior has been rated as category six severity because it involved fraud in excess of $1 million. Your salient factor score (SFS–81) is 8. You have been in federal confinement as a result of your behavior for a total of 63 months.... The Guidelines indicate a range of 40–52 months to be served before release for cases with good institutional adjustment and program achievement. After review of all relevant factors and information presented a decision above the guidelines appears warranted because: your behavior involved the following aggravating factors: The fraudulent behavior to have $20 million transferred from funds which you than [sic] used to make speculative high risk investments (ultimately causing a loss of

$4.5 million), took place over an extended period of time (2 years) 1982–84. The offense was also committed while you pretended to cooperate with officials and while you were on appeal bond from another federal offense. In addition you attempted to evade taxes on money received unrelated to your criminal behavior and also attempted to influence testimony before a Grand Jury. You are a poorer risk than indicated by your salient factor score because you attempted to conceal your profits and escape from punishment by faking your death.

> As required by law, you have also been scheduled for a statutory interim hearing during March, 1995.

Friedland appealed the Commission's action. On July 27, 1993, the Commission issued a Notice of Action on Appeal in which it affirmed the previous decision by stating that:

> All relevant factors have been considered and no new or significant information is presented which would justify a more lenient decision.

### F. *Friedland's Subsequent Efforts*

After the parole hearing Friedland went back to the United States Attorney's Office for the Eastern District of New York to solicit their assistance in reducing his sentence, and on July 18, 1994, Friedland met with Eastern District AUSAs Notopoulos and Valerie Caproni. At that meeting Friedland's attorneys were advised that: (a) they should be discussing the matter with the United States Attorney for the District of New Jersey, (b) the Eastern District of New York had no jurisdiction to file a motion for reduction in New Jersey, (c) they would not change the substance of Notopoulos's March 7, 1993 letter, but (d) they would, if requested, make available to New Jersey authorities the complete details (names of those arrested and convicted, sentences imposed and quantities of drugs seized) of all prosecutions that flowed from Friedland's assistance. However, the United States Attorney's Office in New Jersey indicated that it had no desire to even discuss the matter.

On September 9, 1994, Friedland submitted three applications to the court. He moved to have his sentence reduced pursuant to Fed.R.Crim.P. 35(b) and filed two petitions for relief from his sentence, one brought pursuant to 28 U.S.C. § 2255 and the other pursuant to 28 U.S.C. § 2241. On December 22, 1994, Friedland also moved for an evidentiary hearing.

## II. *ANALYSIS*

### A. *Fed.R.Crim.P. 35*

The Sentencing Act of 1987 states that Rule 35(b) as it existed prior to November 1, 1987, ("old Rule 35") applies to all crimes committed before that date. Pub.L. 100–182, § 22, 101 Stat. 1266, 1271. However, courts have held that Rule 35 as it exists today ("new Rule 35") is also applicable to offenses committed prior to November 1, 1987. *United States v. Hernandez*, 34 F.3d 998, 999 n. 1 (11th Cir.1994); *United States v. Weaver*, 884 F.2d 549, 550 (11th Cir.1989).[1] Therefore, the court will discuss Friedland's motion under both old and new Rules 35.

### 1. New Rule 35(b)

Fed.R.Crim.P. 35(b) as it stands today reads, in pertinent part:

> The court, on motion of the Government made within one year after the imposition of sentence, may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense.... The court may consider a Government motion to reduce a sentence made one year or more after imposition of the sentence where the defendant's substantial assistance involves information or evidence not known to the defendant until one year or more after the imposition of sentence.

New Rule 35(b) does not allow a court to reduce a defendant's sentence except on motion of the government. *United States v. Francois*, 889 F.2d 1341, 1345 (4th Cir.1989). In this case the government has made no such motion.[2]

*Wade v. United States*, 504 U.S. 181, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992), held that, even when a defendant has provided assistance to prosecutors, the government may refuse to move for a downward departure under 18 U.S.C. § 3553(e) or USSG § 5K1.1 unless the refusal is based on constitutionally suspect grounds such as race or religion. *Id.,* 504 U.S. at 186, 112 S.Ct. at 1844.

> It follows that a claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing. Nor would additional but generalized allegations of improper motive.

*Id.* *Wade* did suggest that if the plea agreement contained a promise to file a § 5K1.1

---

**1.** Although the court in *Weaver* referred to an interim version of rule 35 there is nothing in new Rule 35 which would suggest that it does not apply to prisoners who were incarcerated before the effective date of the rule.

**2.** USSG § 5K1.1, 18 U.S.C. § 3553(e), and new Rule 35(b) all refer to substantial assistance given by a *defendant*, which raises the issue of whether third party information or brokered information meets this requirement. Judge T.S. Ellis, III recently discussed this issue and held that

> [W]hen (1) the defendant plays some role in instigating, requesting, providing, or directing the assistance; (2) the government would not have received the assistance but for the defendant's participation; (3) the assistance is rendered gratuitously; and (4) the court finds that no other circumstances weigh against rewarding the assistance

surrogate assistance would justify the court in granting a government motion under Rule 35(b) or USSG § 5K1.1. *United States v. Doe*, 870 F.Supp. 702, 708 (E.D.Va.1994). However, Judge Ellis made it clear that in his view such surrogate assistance would only infrequently be the basis of a Rule 35(b) or § 5K1.1 motion and would be confined to cases "where a close friend or relative works with and on behalf of the defendant in providing the assistance." *Id.* He was also concerned that a wealthy defendant would purchase information with the result that "a wealthy person [could] purchase a lighter sentence than of an indigent." *Id.* at 708. Thus, he held "that another boundary confining the use of surrogate substantial assistance is that the assistance must be provided gratuitously and from a non-remunerative desire to help the defendant." *Id.* at 708. For purposes of this opinion we assume, but do not hold, that the type of information provided by Friedland was sufficient to support a motion under new Rule 35(b) and was not purchased by Friedland from other sources, a practice about which we share the view of Judge Ellis.

motion, such promise might supersede the requirement that the government file a motion. *Id.,* 504 U.S. at 184–85, 112 S.Ct. at 1843. Friedland alleges both that the government obligated itself to file a new Rule 35(b) motion and that the government had an unconstitutional motive for its refusal to file.

### a. *Contractual Obligation*

Friedland argues that Agent Longarzo's promises contractually obligated the government to file a Rule 35(b) motion. The analogy between Friedland's alleged agreement and a plea agreement is inapposite. Promises made by prosecutors in the course of plea agreements are strictly scrutinized because a defendant's plea of guilty to a criminal charge involves the waiver of many constitutional rights. *See Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984). The agreement alleged by Friedland involved no waiver of constitutional rights.

A defendant's waiver of constitutional rights is not the only factor which sets a plea apart from the agreement alleged by Friedland. Fed.R.Crim.P. 11 sets forth several very specific requirements for a valid plea. The court must address the defendant personally in open court. The court must inform the defendant of the rights that the defendant is waiving in making a guilty plea. The court must also inquire as to whether the plea is voluntary and whether the plea agreement is accurate.

Perhaps the most important distinction is that a plea agreement must be disclosed on the record. This record then becomes the embodiment of the deal reached between the defendant and the prosecution. *See, e.g., United States v. Baylin,* 696 F.2d 1030, 1037 n. 16 (3d Cir.1982); *Martinez v. United States,* 411 F.Supp. 1352 (D.N.J. 1976), *aff'd mem.,* 547 F.2d 1162 (3d Cir. 1977). The purpose of Rule 11 is not only to detect and reject involuntary and unknowing guilty pleas but also to produce a suitable record of the plea and plea agreement. *Martinez,* 411 F.Supp. at 1357. This suitable record is notably absent in the case now before this court.

The Court in *Wade* referred only to contractual obligations which arose from a plea bargain. *Wade,* 504 U.S. at 184–85, 112 S.Ct. at 1843. Friedland has not been able to provide the court a single case which supports his contention that the principle in *Wade* is equally applicable to agreements outside the context of a plea bargain. *Wade* only refers to plea agreements, and the interaction between Friedland and the government was neither a plea agreement nor sufficiently analogous to a plea agreement to invoke *Wade. Cf. United States v. Carter,* 454 F.2d 426 (4th Cir.1972) (promises made by the United States Attorney for the District of Columbia in the course of plea bargaining binding on the United States Attorney for the Eastern District of Virginia); *Palermo v. Warden,* 545 F.2d 286 (2d Cir. 1976) (promises during plea negotiations that defendant will receive early parole on previous sentence may be enforceable); *Hernandez,* 34 F.3d at 1000 (appeal of the denial of Rule 35 motion allowed "when the district court's ruling implicates the plea agreement" and is necessary to "make the terms of the plea agreement fully enforceable").

Even if Agent Longarzo made the statements alleged and even if those statements were specific enough to consider as promises upon which Friedland could have reasonably relied, there is no evidence that Longarzo had authorization to make those promises. A DEA Agent is not part of the prosecution team, and any promise made by Longarzo would not bind the United States Attorney. *LaPorta v. United States,* 651 F.Supp. 884, 890 (E.D.Pa.1986).

Unauthorized plea bargain promises to a criminal defendant are not binding on the government absent exceptional circumstances. *LaPorta,* 651 F.Supp. at 890; *see also United States v. Hudson,* 609 F.2d 1326, 1328–28 (9th Cir.1979) (government was not bound by Secret Service Agent's unauthorized promise to defendant); *United States v. Lombardozzi,* 467 F.2d 160, 162 (2d Cir.1972) (government not bound by FBI agent's assurances). There is little indication that Longarzo's alleged promise was authorized by the government, and, in fact, Friedland

clearly knew that the United States Attorney for the District of New Jersey did not and would not approve such a deal.

### b. *Constitutionality*

█ Friedland argues, based upon his reading of *Wade,* that the United States Attorney was acting selectively invidious in refusing to file a Rule 35(b) motion. Federal district courts do have the authority "to grant a remedy if they find that the refusal was based on an unconstitutional motive" such as race or religion. *Wade,* 504 U.S. at 185–86, 112 S.Ct. at 1844. However, a generalized allegation of improper motive is insufficient to raise a cognizable claim of a constitutional violation. *Id.* Even where there is an appropriate claim of improper motive, there are no grounds for an evidentiary hearing unless the defendant makes a substantial threshold showing of invidious intent. *Id.* Finally, an appropriate claim of improper motive can be rebutted if a prosecutor's refusal to move for a reduction is rationally related to a legitimate government objective. *Id.*

█ Here Friedland has not clearly stated how the prosecutor's failure to file a Rule 35(b) motion was unconstitutionally motivated. He has made no claim that he has been discriminated against because of his membership in a protected class or for his exercise of a constitutionally protected freedom. His claim appears to be that he was discriminated against "not because of his race or religion, but because he is in the class of individuals who have offended the United States Attorney." This is a generalized allegation of improper motive and not the constitutional violation required to allow relief under the principles enunciated in *Wade.*

Friedland might be entitled to relief if he could establish that the prosecutor's refusal to file a Rule 35(b) motion was not rationally related to a legitimate government objective. *Wade,* 504 U.S. at 186, 112 S.Ct. at 1844. Although the government has proffered vari-

ous motives for failing to file a Rule 35(b) motion on Friedland's behalf,[3] it is defendant's burden, not the government's, to produce evidence of an illicit government motive which would "rise to the level warranting judicial enquiry." *Id.* Given Friedland's prior conduct in dealing with the government and the understandable government reluctance to assist in the creation of a marketplace in which prisoners seek to barter information for sentence reductions, the "Government's decision not to move may be based not on a failure to acknowledge or appreciate [Friedland's] help, but simply on its rational assessment of the cost and benefit that would flow from moving." *Id.*

### c. *Is 5K1.1 Invalid?*

In discussing relief under new Rule 35, Friedland spends considerable time arguing that USSG § 5K1.1 is invalid because the Sentencing Commission was authorized to promulgate Guidelines, and no Guideline relates to § 5K1.1. Friedland then reasons that because § 5K1.1 is invalid, the government motion requirement of new Rule 35 is not binding and the court may reduce his sentence without such a motion.

However, the requirement of a government motion under new Rule 35 does not arise from § 5K1.1, but from its own terms which condition relief "on motion of the Government." Thus, even if Friedland is correct in asserting that § 5K1.1 is invalid, a palpably silly argument, that determination would not effect the requirement of a government motion under new Rule 35.

### 2. **Old Rule 35**

Friedland has asked the court to consider his motion under old Rule 35 which provided, in pertinent part:

> A motion to reduce sentence may be made, or the court may reduce a sentence without motion, within 120 days after the sentence is imposed or probation revoked, or within 120 days after receipt by the court of a mandate issued upon affirmance of the

---

3. The government also contends that it did not make a Rule 35(b) motion because (i) it believed that the law did not permit such a motion; (ii) Friedland had previously abused a cooperating relationship with the government; and (iii)

Friedland's assistance was provided with the advance knowledge that the government believed that it was not sufficiently "substantial" to justify a Rule 35(b) motion.

judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court denying review or having the effect of upholding a judgment of conviction or probation revocation. . . .

Under old Rule 35 the court had jurisdiction to reduce a sentence only if the defendant filed a motion for reduction of sentence within 120 days of the court's imposition of a judgment of conviction. The 120 day limit is a jurisdictional and may not be extended. *United States v. Addonizio,* 442 U.S. 178, 189, 99 S.Ct. 2235, 2242, 60 L.Ed.2d 805 (1979); *United States v. Dansker,* 581 F.2d 69 (3d Cir.1978). Friedland attempts to overcome this jurisdictional problem by styling his present motion as one for reconsideration of his earlier, timely Rule 35 motion which he filed on March 30, 1989.

A court cannot extend the 120 day window in old Rule 35 with a motion for reconsideration if that motion raises new grounds for relief. *See United States v. Inendino,* 655 F.2d 108 (7th Cir.1981) (District court does not have jurisdiction to consider new evidence presented in defendant's untimely motion to reconsider district court's denial of his 35(b) motion); *United States v. Hetrick,* 644 F.2d 752 (9th Cir.1980) (Timely filing of motion to reduce sentence did not give district court jurisdiction to entertain subsequent, untimely motion to reduce sentence, and this defect was not cured by styling the second motion as a "motion for reconsideration"); *United States v. Coonan,* 750 F.Supp. 652, 657 (S.D.N.Y.1990) (A district court only has jurisdiction where the defendant is not seeking to evade a jurisdictional defect by styling a subsequent Rule 35(b) motion for reduction of sentence as a motion for reconsideration).

Friedland's first motion for reduction of sentence under old Rule 35(b), filed on March 30, 1989, was based primarily on claims that the court had imposed an excessive sentence. Although Friedland offered additional mitigation evidence, the court denied the motion on May 24, 1989. His program, the basis of his present "reconsideration" motion, did not exist at the time his initial motion was filed, and the court does not have jurisdiction to revisit Judge Gerry's 1989 decision denying relief.

**B. *28 U.S.C. § 2255***

28 U.S.C. § 2255 allows a prisoner to file a habeas corpus petition with the sentencing court alleging that his sentence was imposed in violation of the Constitution. If the court finds for the prisoner, it may, *inter alia,* resentence the prisoner in accordance with the Constitution or it may set the conviction aside. 28 U.S.C. § 2255.

Friedland argues that (i) the United States Attorney has been "selectively invidious" in failing to file a Rule 35(b) motion on his behalf and (ii) the government's failure to file a Rule 35(b) motion breached his contract with the government. As relief for these "injustices" Friedland asks the court to vacate his sentence and release him from prison. These claims are substantively identical to Friedland's motion pursuant to new Rule 35(b), discussed *supra,* and are therefore dismissed for the reasons stated above.

**C. *28 U.S.C. § 2241***

Friedland has also brought a habeas petition against the Commission pursuant to 28 U.S.C. § 2241 which is a proper vehicle for a prisoner in federal custody to challenge a parole decision. *United States v. Ferri,* 686 F.2d 147, 158 (3d Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983). Commission decisions will be upheld if there is a rational basis in the record to support the Commission's findings. *Bridge v. United States Parole Comm'n,* 981 F.2d 97, 100 (3d Cir.1992); *Campbell v. United States Parole Comm'n,* 704 F.2d 106, 110 (3d Cir.1983). The district court must be satisfied that the Commission has followed criteria that are appropriate, rational, and consistent with its statute and that its decision is neither arbitrary nor capricious nor based on impermissible considerations. *Zannino v. Arnold,* 531 F.2d 687, 691 (3d Cir.1976).

**1. Offense severity as level six**

Friedland argues that the Commission improperly applied the Parole Guidelines when

it rated his offense severity as level six rather than five. First, he claims that because he returned all assets wrongfully diverted from the Pension Fund the victim of his crime did not suffer a loss in excess of $1,000,000, the threshold for level six. Second, he asserts that the Commission improperly considered unadjudicated conduct in making its determination.

The Commission regulation in effect on March 10, 1993, the date of Friedland's hearing, provided:

> The "value of the property" is determined by estimating the actual or potential replacement cost to the victim. The "actual replacement cost" is the value or money permanently lost to the victim through theft/forgery/fraud. The "potential replacement cost" refers to the total loss the offender specifically intended to cause by theft/forgery/fraud notwithstanding subsequent recovery by the victim. The highest of these three values is to be used in rating the offense on the guidelines.

28 C.F.R. § 2.20, Ch. 13, Sub. B(20) (1993). This regulation sets forth the common sense notion that the size of a theft, forgery or fraud is not diminished because the felon thereafter satisfies his legal obligation to restore the purloined property to its rightful owner.

 The Commission properly considered the total which Friedland fraudulently siphoned from the Pension Fund. Not only did Friedland admit at his initial hearing that he had arranged for an improper transfer of $20,000,000 to Omni, but the presentence report also indicates that approximately $1,200,000 of Omni's profits were wired to the Bahamas on Friedland's behalf and another $1,000,000 in cash and gold coins were split by Friedland and another conspirator. There is a rational, if not overwhelming, basis in the record to support the Commission's rating of his offense as a fraud involving more than $1,000,000.

 Friedland also contends that it was inappropriate for the Commission to consider information in the presentence report which referred to unadjudicated conduct. The Commission may rely on the presentence report in making its parole determination, including information with respect to related counts in an indictment on which the defendant has not been found guilty. *United States ex. rel. Goldberg v. Warden,* 622 F.2d 60, 64 (3d Cir.1980); *Campbell,* 704 F.2d at 110. Friedland does not make clear in his briefs or affidavits what uncharged conduct was relied upon by the Commission. He was never separately indicted for his faked death and flight to the Maldive Islands, but this is precisely the type of conduct the Commission might and should consider in reaching a determination.

Relying on the Eighth Circuit's dictum in *Wixom v. United States,* 585 F.2d 920 (8th Cir.1978), Friedland argues that the Commission may not consider information in the presentence report to which defense counsel has objected. However, the Eighth Circuit has declined to follow its own dictum and has held that the Commission may rely on disputed portions of the presentence report, even if the sentencing judge chose to disregard that disputed information. *Blue v. Lacy,* 857 F.2d 479, 481 (8th Cir.1988). *See also Ochoa v. United States,* 819 F.2d 366, 372 (2d Cir.1987); *Kramer v. Jenkins,* 803 F.2d 896, 900, *clarified on reh'g,* 806 F.2d 140 (7th Cir.1986).

Friedland can point to very little in the presentence report which is factually inaccurate. He challenges the inclusion of a claim from the United States Attorney that "he will say anything to minimize his punishment and speed the day when he emerges from prison so he can rejoin his money overseas." Presentence Report p. 5 (December 2, 1988). He likewise objects to the United States attorney including a raft of newspaper clippings in its submission to the Commission. Suffice it to say that the record does not support the notion that either of these items influenced a decision based on a wealth of uncontested factual information.

## 2. Exceeding the guidelines

Friedland contends that the Commission improperly denied him parole because it exceeded the parole guidelines without good cause. The statute provides that, "[t]he Commission may grant or deny release on parole notwithstanding the guideline ... if it

determines there is good cause for so doing...." 18 U.S.C. 4206(c).

The Commission's listed five factors to support its decision to exceed the guidelines: (1) the fraudulent activity occurred over an extended period of time; (2) the offense was committed while Friedland was pretending to cooperate with government officials; (3) Friedland was released on bail from another federal offense at the time he committed the RICO offenses; (4) Friedland was involved in additional criminal behavior in attempting to evade taxes and attempting to influence testimony before a grand jury proceeding; and (5) Friedland attempted to conceal his profits and faked his own death to escape punishment. The Commission concluded that these factors render him a poorer risk then his "very good" salient factor score indicates.

Friedland contends that the Commission may not consider that his offenses took place over an extended period of time because a RICO offense necessarily includes a pattern of racketeering activity occurring over time and is an inherent part of the offense itself. *See Harris v. Martin*, 792 F.2d 52, 55 (3d Cir.1986) (improper to use the same factor in scoring prisoner pursuant to parole guidelines and as aggravating factor justifying decision above guidelines).

■ This argument is not persuasive. The level six severity rating was based on the size of the fraud, not its duration. Although RICO does require a pattern of illegal activity, the extensiveness of the conspiracy and the period over which it extends can vary widely from case to case. Both the scope and duration of a conspiracy in particular instances are proper considerations for the Commission in deciding whether to exceed the guidelines. *See, e.g., Beltempo v. Hadden*, 815 F.2d 873, 875 (2d Cir.1987); *Pilotto v. United States Parole Comm'n*, 857 F.2d 474, 476 (8th Cir.1988).

■ Friedland takes umbrage at the Commission's finding that he was only "pretending to cooperate" when he committed the offenses which were the subject of *Friedland II*. Friedland asserts that his cooperation was genuine and lists examples of his help to the government during this period. However-

er, given his felonious behavior while rendering this assistance, there is more than a rational basis for the Commission's determination that his cooperation was only a pretense.

■ Friedland argues that the Commission improperly considered that he was out on bail when he committed the crimes underlying *Friedland II*. The defendant has not been deterred from criminal conduct by contact with the criminal justice system, and the Commission is not double counting when it relies on the defendant's poor behavior while on bail in fixing a release date beyond the guidelines. *Walker v. United States*, 816 F.2d 1313, 1316 (9th Cir.1987); *Wiggins v. Nelson*, 510 F.Supp. 666, 668 (D.Conn.1981).

Friedland argues that the Commission erred in considering his convictions for tax evasion and attempting to influence testimony before the grand jury in their decision to exceed the guidelines, because these offenses were used to determine his offense severity level. Friedland simply ignores that the level six severity rating was based on his fraudulent diversions from the Pension Fund in excess of $1,000,000. There was no double counting when the Commission also weighed his other offenses.

Friedland questions whether there is a rational basis in the record for the Commission's conclusion that he attempted to conceal the profits from his illegal activities. However, the presentence report discloses that gold coins and cash, as well as a $1.2 million wire transfer to accounts controlled by Friedland in the Bahamas, were utilized to conceal the loot.

Finally, Friedland contends that it was impermissible for the Commission to consider his attempt to escape punishment by faking his death because that factor was used to lower his offender characteristic from "very good" to "good" and thus increase his guideline range from 40–52 months to 52–64 months. 28 C.F.R. § 2.20 (table captioned "Guidelines for Decision Making") and

§ 2.36. However, the Commission never in fact made that adjustment.[4]

### 3. Use of Sentencing Guidelines

 Friedland argues that the Commission improperly failed to calculate the applicable Sentencing Guidelines in this case and then apply the lesser of the Sentencing Guidelines or the Parole Guidelines.[5] The only support which Friedland cites as authority for this proposition is a footnote in the legislative history of the Sentencing Reform Act. Footnote 430 of the Senate Reports states, "[t]he Committee intends that in the final setting of release dates under this provision, the Parole Commissioner gives the prisoner the benefit of the applicable new sentencing guideline if it is lower than the minimum parole guideline." S.Rep. No. 98–225 98th Cong., 189 n. 430, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3372. However, this footnote was not included in the final version of the Sentencing Reform Act.

 The footnote refers to § 235(b)(3) of the Sentencing Reform Act of 1984 which contains no language with regard to the Sentencing Guidelines.[6] The statute, as it was enacted, cannot reasonably be interpreted as Friedland suggests. Legislative history is meant to be instructive as to the interpretation of enacted legislation and not to create extra statutory law. *Church of Scientology v. Internal Revenue Service,* 792 F.2d 153, 164 n. 4 (D.C.Cir.1986). A particular iteration of a complex piece of legislation, which iteration is superseded by later versions, is not somehow incorporated in the legislation which is ultimately enacted.

### 4. Credit for superior program achievement

 Friedland asserts that the Commission abused its discretion by failing to award

him credit for superior program achievement. The relevant regulations provide, in pertinent parts:

> Prisoners who demonstrate superior program achievement (in addition to a good conduct record) may be considered for a limited advancement of the presumptive date previously set according to the schedule below.... Upon a finding of superior program achievement, a previously set presumptive date may be advanced.

28 C.F.R. § 2.60.

> The Commission may consider as a factor in the parole release decisionmaking a prisoner's assistance to law enforcement authorities in the prosecution of other offenders.... If the assistance meets the above criteria, the commission may consider providing a reduction of up to one year from the presumptive parole date that the Commission would have been warranted had such assistance not occurred.

28 C.F.R. § 2.63.

Because § 2.60 uses permissive rather than mandatory language, courts have held that the Commission need not award any advancement even if the criteria of the regulation are met. *Otsuki v. United States Parole Comm'n,* 777 F.2d 585 (10th Cir.1985); *Kele v. Carlson,* 877 F.2d 775 (9th Cir.1989); *Briggs v. United States Parole Comm'n,* 611 F.Supp. 306 (N.D.Ill.1984) *aff'd sub. nom., Briggs v. Luther,* 753 F.2d 1077 (7th Cir. 1985). The language of § 2.63, like that of § 2.60, is permissive rather the mandatory, and therefore, we believe the same reasoning applies. The Commission did consider Friedland's superior program achievement as

---

**4.** Friedland relied on documents not adopted by the Commission in making this assertion.

**5.** In this case the Sentencing Guidelines lead to a greater sentence than the Parole Guidelines. It was only because of the Commissions departure from the Parole Guidelines that the Sentencing Guidelines lead to a shorter sentence.

**6.** That section states:

> The United States Parole Commission shall set a release date, for an individual who will be in its jurisdiction on the day before the expiration

of ten years after the effective date of this act, pursuant to section 4206 of title 18 United States Code. A release set pursuant to this paragraph shall be set early enough to permit consideration of an appeal of the release date, in accordance with parole commission procedures, before the expiration of ten years following the effective date of this act.

Sentencing Reform Act of 1984 § 235(b)(3), Pub L. 98–473, 98 Stat.1987, *as amended by* the Sentencing Act of 1987, § 2(b)(2) Pub.L. 100–182 and the Judicial Improvements Act of 1990, § 316 Pub.L. 101–650, 104 Stat. 5089, 5115 (December 1, 1990)).

well as his cooperation.[7] However, the Commission concluded that these factors were outweighed by the other factors present in this case.

### 5. Commission's original jurisdiction

Friedland's parole hearing was determined to be within the original jurisdiction of the Regional Parole Commissioners. Friedland argues that this determination was in error and has prejudiced his parole application and that, in any event, he deserved notice of this designation and an opportunity to challenge it.

■ The criteria for designating a case as original jurisdiction is set out in 28 C.F.R. § 2.17. The Commission in this case determined that Friedland was appropriate for original jurisdiction because of "the publicity generated in the New York/New Jersey area." This is an appropriate basis for original jurisdiction under 28 C.F.R. § 2.17(b)(3) which covers prisoners who have received national or unusual attention. Further, as the U.S. Attorney points out, original jurisdiction would also have been proper because 28 C.F.R. § 2.17(b)(2) covers "[p]risoners whose offense behavior: (i) involved an unusual degree of sophistication or planning, or (ii) was part of a large scale criminal conspiracy or a continuing criminal enterprise." Therefore, the Commission was properly following its own regulations in designating this case for original jurisdiction.

■ Friedland has not established that he was prejudiced by the determination of original jurisdiction. In the absence of a showing of prejudice he is not entitled to habeas corpus relief even had there been an error. *D'Amato v. United States Parole Comm'n*, 837 F.2d 72, 77 (2d Cir.1988); *Hanahan v. Luther*, 693 F.2d 629 (7th Cir.1982); *White v. United States Parole Comm'n*, 856 F.2d 59, 61 (8th Cir.1988); *Sacasas v. Rison*, 755 F.2d 1533, 1535 (11th Cir.1985).

### 6. Parole Commission extension

When Friedland was sentenced on December 2, 1988, Judge Gerry completed the "Report on Committed Offender" which asked "Referring to the probation officer's estimate of the parole guidelines given above [40–52 months], [what] do you believe the time served by this defendant should be?" Judge Gerry checked the box which indicated "Within the Guidelines." In response to another query concerning the relative culpability of the offender in a multi-defendant case, the court noted "most culpable."

Friedland argues that both the court and the parties believed that the Commission was to be abolished in 1992, giving him an enforceable expectation that he would be released after the statutorily mandated service of one-third of his fifteen year sentence,[8] a term in excess of Judge Gerry's recommendation that he serve only 40–52 months. This argument flies in the face of binding precedent.

■ In *United States v. Addonizio*, 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) the sentencing judge had "anticipated—assuming an appropriate institutional adjustment and good behavior while confined—that [Addonizio] would be confined for a period of approximately three and one half to four years of the ten year sentence." *Id.* at 183, 99 S.Ct. at 2239. Although this sentencing expectation was frustrated by the Commission's adoption of new policies and procedures, the Court held that "subsequent actions taken by the parole commission—whether or not such actions accord with a trial judge's expectations at the time of sentencing—do not retroactively affect the validity of the judgment itself." *Id.* at 190, 99 S.Ct. at 2243. Therefore, even Judge Gerry's recommendation that Friedland be paroled after service of his minimum sentence is not enough to support Friedland's habeas petition, unless, as Friedland argues, *Addonizio* is not applicable.

---

**7.** It is noteworthy that the regulations state that the Commission "may consider" prisoner's superior program achievement, therefore, the act of consideration itself is optional.

**8.** 18 U.S.C. § 4205(a) (repealed Pub.L. 98–473, Title II, § 218(a)(5), Oct. 12, 1984, 98 Stat. 2027).

Under the Crime Control Act of 1984 the Commission was to be abolished in 1992, five years after the Act's effective date. Pub.L. 98–473, §§ 218(a)(5), 235(b)(1), 98 Stat. 2027, 2032.[9] The life of the Commission was thereafter extended for an additional five years to 1997. Pub.L. 101–650, Title III, § 316, 104 Stat. 5115. Before its demise the Commission was to set release dates for all prisoners under its jurisdiction. Pub.L. 98–473, § 235(b)(3), 98 Stat. 2032. The conditions of confinement set by the Commission were to remain in force unless changed by a district court. *Id.* § 235(b)(4). Therefore, Friedland argues, Judge Gerry's recommendation as to the period of incarceration is significant because under the law then in effect it was anticipated that the district court would become the de facto parole commission when the Commission was abolished.

While this argument is creative, it is not persuasive. Under the Crime Control Act of 1984 the terms and conditions of confinement were to be set by the Commission, not the district court. *Id.* Although the district court was to be given authority over prisoners after the Commission's abolition, that authority was supplemental to the terms and conditions set by the Commission. It is possible that, if the life of the Commission had not been extended, Judge Gerry might have changed the release date set by the Commission.[10] However, this is far too tenuous a hypothetical to distinguish *Addonizio.*

### D. *Evidentiary Hearing*

■ On December 22, 1994, Friedland moved for an evidentiary hearing on these motions because there are several disputed issues of material fact. When a prisoner files a motion pursuant to 28 U.S.C. § 2255, the district court must hold an evidentiary hearing unless the "motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief." *Id.* *See also United States v. Nahodil,* 36 F.3d 323, 325 (3d Cir.1994); *United States v. Day,* 969 F.2d 39, 41–42 (3d Cir.1992); *Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir. 1989).

■ Whether to order a hearing is within the sound discretion of the trial court. *Day,* 969 F.2d at 41–42; *Forte,* 865 F.2d at 62. In exercising that discretion the court must accept the truth of the movant's factual allegations unless the record shows them to be clearly frivolous. *Day,* 969 F.2d at 41–42; *Forte,* 865 F.2d at 62.[11] Is not necessary to hold an evidentiary hearing on this matter because it is clear from the record that Friedland is not entitled to relief under Rule 35, § 2255 or § 2241, even if we accept Friedland's version of the facts.

### III. *CONCLUSION*

For the reasons set forth above, Friedland's motion for reconsideration of sentence pursuant to Fed.R.Crim.P. 35(b) and his petitions for Habeas Corpus relief pursuant to 28 U.S.C. § 2255 and 28 U.S.C. § 2241 are denied. Finally, Friedland's motion for an evidentiary hearing is also denied. An appropriate order will issue on even date herewith.

---

9. This date was subsequently extended to 1997. Pub.L. 101–650, Title III, § 316, Dec. 1, 1990, 104 Stat. 5115.

10. Thankfully we need not determine whether the district court's authority to change a release date fixed by the Commission before its demise was limited to changes based on events occurring thereafter, such as an institutional infraction.

11. The standard for section 2241 claims is essentially the same. See, *Tijerina v. Thornburgh,* 884 F.2d 861 (5th Cir.1989) (where prisoner raises only issues of law or questions regarding legal implications of undisputed facts in section 2241 proceeding, a hearing is unnecessary); *Wright v. Dickson,* 336 F.2d 878 (9th Cir.1964), *cert. denied* 386 U.S. 1012, 87 S.Ct. 1360, 18 L.Ed.2d 444 (1967) (There is no need for a hearing where it appears from undisputed facts that petitioner is not entitled to discharge).