

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-1996

# USA v. Friedland

Precedential or Non-Precedential:

Docket 95-5582,95-5583,95-5584

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"USA v. Friedland" (1996). *1996 Decisions.* Paper 179.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/179

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 95-5582/5583/5584


UNITED STATES OF AMERICA

v.

DAVID FRIEDLAND

David J. Friedland,

Appellant in No. 95-5582


DAVID FRIEDLAND

v.

DOUGLAS LANSING, Warden,
Federal Correctional Institution,
Ft. Dix, NJ; UNITED STATES
PAROLE COMMISSION

David J. Friedland,

Appellant in No. 95-5583


DAVID FRIEDLAND

v.

UNITED STATES OF AMERICA

David J. Friedland,

Appellant in No. 95-5584


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. No. 85-332-1;
D.C. Civil Nos. 94-4463 and 94-4464)


Argued March 29, 1996

BEFORE: GREENBERG, ROTH, and ROSENN, Circuit Judges

(Filed: May 17, 1996)

Brian W. Shaughnessy (argued)
Shaughnessy, Borowski & Gagner
1155 15th Street, N.W.
Suite 502
Washington, DC 20005

        Attorneys for Appellant

Kevin McNulty
Assistant United States Attorney
Faith S. Hochberg
United States Attorney
970 Broad Street
Room 502
Newark, NJ 07102

George S. Leone (argued)
Assistant United States Attorney
4th & Cooper Streets
Mitchell H. Cohen Courthouse
One John F. Gerry Plaza
Camden, NJ 08101

        Attorneys for Appellees

OPINION OF THE COURT


GREENBERG, Circuit Judge.

David Friedland appeals from orders entered on March 2, 1995, and August 3, 1995, in these post-conviction proceedings in which he seeks release from incarceration. The district court denied his applications by the order of March 2, 1995, implementing the conclusions it reached in United States v. Friedland, 879 F. Supp. 420 (D.N.J. 1995), and denied his motion for reconsideration by the order of August 3, 1995. Essentially, Friedland claims that his continued incarceration through denial of parole contravenes the intentions of the district court when it sentenced him and is not justifiable under the parole guidelines and that his cooperation with agents of the United States Government in furthering criminal prosecutions and the interdiction of narcotics entitles him to have his sentence shortened by the district court pursuant to Fed. R. Crim. P. 35(b).

I.  FACTUAL AND PROCEDURAL BACKGROUND

The case has an extraordinary background. Friedland, who has been a New Jersey state senator, was general counsel to the Teamsters Local 701 Pension Fund in North Brunswick, New Jersey in the 1970s. He used this position to obtain kickbacks for arranging loans from the pension fund. This conduct and his

efforts to cover it up led to his indictment and conviction for conspiracy, soliciting and receiving kickbacks, interstate and foreign travel to facilitate bribery, obstruction of justice, and income tax evasion. The district court sentenced Friedland to seven years in prison and we affirmed. United States v. Friedland, 660 F.2d 919, 922-25 (3d Cir. 1981), cert. denied, 456 U.S. 989, 102 S.Ct. 2268 (1982).

Following his conviction, Friedland avoided serving his sentence by agreeing to cooperate with the government in the investigation of other crimes. However, he took this opportunity to engage in additional criminal activity involving the Local 701 pension fund. See United States v. Zauber, 857 F.2d 137, 140-42 & n.1, 153 (3d Cir. 1988), cert. denied, 489 U.S. 1066, 109 S.Ct. 1349 (1989). At that time, instead of receiving kickbacks, Friedland began paying them to obtain money from the Pension Fund for high risk investments.

When his second and independent criminal episode began to unravel, Friedland took a unique step to avoid apprehension. In 1985, he staged his drowning in a scuba-diving accident in the Bahamas. We presume that Friedland hoped that the government simply would write him off so that he could avoid apprehension. While we do not know whether the government agents ever thought Friedland was dead, for more than two years he did remain at large. However, in December 1987 he was found and arrested on the Maldive Islands in the Indian Ocean. He then was returned to New Jersey for trial on an indictment for the second group of offenses. This trial ended when, pursuant to a plea agreement, Friedland pleaded guilty to a count charging RICO conspiracy. On December 2, 1988, the court sentenced Friedland on this count to a 15-year custodial term to be served concurrently to the seven-year term imposed on his original convictions. App. 81. At that time, the court had a report from a probation officer calculating Friedland's parole guideline range as between 40 and 52 months, and the court indicated that it believed that Friedland should serve a term within that range. App. 70-71. On March 30, 1989, Friedland filed a timely motion for reduction of sentence under Fed. R. Crim. P. 35(b), but following a hearing on May 12, 1989, the district court entered an order denying the motion. Supp. app. 7, 8.

While one might have thought that Friedland's ability to scheme now had been exhausted, events prove that this was not so. In early 1989, his attorney approached the United States Attorney in New Jersey and offered Friedland's services in supplying information regarding certain crimes. On April 3, 1989, Samuel A. Alito, Jr., then the United States Attorney for the District of New Jersey, wrote the attorney and said that, while his office would accept any information, he was making it "absolutely clear . . . [his office] will not make any promises, express or implied, to do anything whatsoever on behalf of your client." App. 78.

This rebuff did not deter Friedland. Rather, he devised what he characterized as a "program" to obtain information regarding illegal drug activity from other inmates that he intended to barter to the government in return for having

his own sentence shortened.  App. 119.  Unfortunately for Friedland, however, Michael Chertoff, who since had replaced Alito as United States Attorney for the District of New Jersey, did not regard the supplying of brokered information as a basis for a reduction of Friedland's sentence.  Chertoff thus continued Alito's attitude toward Friedland.

Undaunted, Friedland sought to circumvent Chertoff by finding other agents of the government who might help him.  This search led him to Anthony Longarzo, a special agent of the Drug Enforcement Administration.  Friedland dealt with Longarzo for about three months in the summer of 1990.  Gov. app. 53-54.  Friedland offered to give information to Longarzo who, according to Friedland, agreed to recommend to the sentencing court and the United State Parole Commission that his sentence be reduced.  Gov. app. at 4-5.  Friedland did deliver information leading to the seizure of narcotics and several arrests.  Id.  Friedland also contacted assistant United States attorneys in districts other than New Jersey seeking to obtain their aid in having his period of incarceration shortened.

Friedland's initial parole hearing was scheduled for early in 1993.  Chertoff opposed his parole and wrote a letter on January 7, 1993, to John R. Simpson, regional commissioner of the United States Parole Commission, expressing his views.  Gov. app. 56.  Chertoff knew that Friedland had been in touch with the United States Attorney's office in the Eastern District of New York, and thus Chertoff sought information from that office regarding Friedland's activities.  In response to Chertoff's request, on March 7, 1993, Patricia E. Notopoulos, an assistant United States attorney for the Eastern District of New York, wrote to Chertoff regarding Friedland.  She indicated that Friedland did not have a written agreement with her office and that her office had made no promises to him.  She stated that, although she told Friedland that she would relay the information he provided to the District of New Jersey, that district "was the sole authority that would decide what benefit, if any, he would receive for the information he provided."  App. 86.  She also related that Friedland had given reliable information to Longarzo that he obtained from another inmate and that, as a result, a "mule" carrying approximately five kilograms of heroin had been arrested at Kennedy Airport.  Id.  She explained that Friedland revealed the name of the informant who had given him the information, and that the informant agreed that Friedland could take the credit for the information.  She further indicated that the informant gave additional information to her office, which led to additional arrests.  App. 87.

On March 9, 1993, Chertoff wrote to Friedland's attorney and enclosed a copy of Notopoulos's letter.  Chertoff indicated that his office generally considered it bad policy to give credit to an individual who was merely brokering someone else's information, and that it did not want to create a "secondary market" in benefits awarded for cooperation.  Chertoff said that his office therefore would continue strongly to oppose Friedland's application for parole.  Gov. app. 59.

On March 10, 1993, a two-person panel of the Parole

Commission held a hearing on Friedland's case and then referred the case to the regional commissioner for an original jurisdiction determination. 28 C.F.R. 2.17(b)(2)(ii). The panel also recommended to the regional commissioner that he set a presumptive parole date of December 24, 1994, which would represent 84 months of incarceration, and that the commissioner require financial disclosure as a special condition of parole. Gov. app. 64.

On March 18, 1993, Chertoff wrote to the regional commissioner arguing against the panel's recommendation for parole. In support of his position, Chertoff enclosed a cover-story from the New York Daily News in which Friedland described his life as a fugitive to a reporter using the French Alps as a backdrop. He also enclosed other newspaper and magazine articles, as well as a transcript of a television interview that Chertoff characterized as glamorizing Friedland and his criminal escapades, particularly his flight as a fugitive. Chertoff pointed out that Friedland had made himself into a high profile celebrity figure. Thus, his parole would be "highly publicized" and would "appropriately be viewed by the public as outrageous given Friedland's crimes and his disdain for the criminal justice system." Gov. app. 66.

On March 25, 1993, the regional commissioner rendered a report referring Friedland's case to the national commissioners and recommending that parole be denied. The regional commissioner decided that the aggravating factors in Friedland's case outweighed his cooperation and favorable institutional adjustment. He reached this conclusion notwithstanding the fact that under the parole guidelines Friedland's offense severity and salient factor score indicated that parole ordinarily would be appropriate. The commissioner alluded to Friedland's fraudulent behavior, and concluded that Friedland was "a more serious risk to the community than a person normally placed in the 'very good' parole risk group." Gov. app. 70.

On April 19, 1993, the national commissioners issued an original jurisdiction decision in Friedland's case. They ruled that Friedland should serve his entire sentence and also should be subject to a special financial disclosure condition. While they recognized that a mechanical application of the parole guidelines provided for a range of 40 to 52 months before parole, they concluded that the aggravating factors in his case warranted a longer sentence. These factors included the diversion of $20,000,000 from the Local 701 Pension Fund for placement in high risk investments which caused the fund a $4,500,000 loss, the fact that Friedland had committed this offense while supposedly cooperating with the government while released on bond, his tax evasion not related to the crime, his attempt at escape by faking his drowning, and an attempt to influence grand jury testimony. The national commissioners, agreeing with the regional commissioner, concluded that Friedland was "a poorer risk than indicated by [his] salient factor score." App. 66. Friedland appealed but the full national Commission affirmed the decision in an opinion dated July 27, 1993, concluding that the original decision complied with applicable regulations. App. 65.

After the denial of parole, Friedland persisted in his efforts to have his sentence reduced by continuing to seek help from assistant United States attorneys from the Eastern District of New York. The Eastern District prosecutors, however, told him that he should discuss his case with the United States Attorney for the District of New Jersey and that they could not file a motion for reduction of his sentence. Gov. app. 9-10.

Subsequently, Friedland instituted the three proceedings leading directly to these appeals. He moved in the district court for reconsideration of his sentence pursuant to Fed. R. Crim. P. 35(b) and brought two petitions for habeas corpus. He filed one petition under 28 U.S.C. 2241, naming as respondents the warden of the Federal Correctional Facility at Fort Dix, New Jersey, where he was then confined, and the United States Parole Commission, and one petition under 28 U.S.C. 2255 in which he sought a reduction of sentence. The district court denied Friedland relief without conducting an evidentiary hearing. United States v. Friedland, 879 F. Supp. 420.

In its opinion, the district court set forth the background described above. It explained that Fed. R. Crim. P. 35(b), which was amended significantly effective November 1, 1987, was applicable in its current form in this case, but that the old form of Rule 35(b) also was applicable, as this case arose before November 1, 1987, when the sentencing guidelines became effective. Friedland, 879 F. Supp. at 426. See United States v. Hernandez, 34 F.3d 998, 999 n.1 (11th Cir 1994); United States v. Weaver, 884 F.2d 549, 850 (11th Cir. 1989). It further pointed out that Rule 35(b) now reads as follows:

Reduction of Sentence for Changed Circumstances. The court, on motion of the Government made within one year after the imposition of the sentence, may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense, in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code. The court may consider a government motion to reduce a sentence made one year or more after imposition of the sentence where the defendant's substantial assistance involves information or evidence not known by the defendant until one year or more after imposition of sentence. The court's authority to reduce a sentence under this subsection includes the authority to reduce such sentence to a level below that established by statute as a minimum sentence.

Consequently, the court could not reduce a defendant's sentence under the new rule absent a motion by the government. Friedland, 879 F. Supp. at 426. See United States v. Francois, 889 F.2d 1341, 1345 (4th Cir. 1989).

The court noted that, in Wade v. United States, 112 S.Ct. 1840 (1992), the Supreme Court held that, even when a defendant has provided assistance to prosecutors, the government can refuse to move for a downwards departure under 18 U.S.C. 3553(e) unless the prosecutor bases the refusal on a constitutionally suspect ground such as race or religion. The district court then indicated that the court might consider such a motion, even if not made by the government, if the government previously had entered into an agreement requiring it. Friedland, 879 F. Supp. at 426-27. The court held that, even if Longarzo's statements were considered promises to Friedland, there was no evidence that Longarzo had the authority to make the promises. Id. at 427. See LaPorta v. United States, 651 F. Supp. 884, 890 (E.D. Pa. 1986). Furthermore, Friedland could not show either that the government had an unconstitutional motive in refusing to file the motion or that its refusal to file the motion was not related to a legitimate government objective. SeeWade, 112 S.Ct. at 1844.

The district court also held that Friedland was not entitled to relief under Fed. R. Crim. P. 35(b) as it existed before November 1, 1987. Friedland, 879 F. Supp. at 428. The rule at that time read as follows:

> Reduction of Sentence. A motion to reduce a sentence may be made, or the court may reduce a sentence without motion, within 120 days after the sentence is imposed or probation is revoked, or within 120 days after receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding, a judgment of conviction or probation revocation. The court shall determine the motion within a reasonable time. Changing a sentence from a sentence of incarceration to a grant of probation shall constitute a permissible reduction of sentence under this subdivision.

The court first indicated that the 120-day limit in the rule was jurisdictional. United States v. Addonizio, 442 U.S. 178, 189, 99 S.Ct. 2235, 2242-43 (1979). While Friedland sought to circumvent the time limit by characterizing his motion as one for reconsideration of his March 30, 1989 motion to reduce his sentence, he could not avoid the rule on this basis because he had developed his "program" to obtain a reduction of his sentence after he had served his original motion. Friedland, 879 F. Supp. at 429. See United States v. Irendino, 655 F.2d 108, 109-10 (7th Cir. 1981).

The court next considered Friedland's petition under 28 U.S.C. 2255. Friedland there argued that the government had been "selectively invidious" in failing to file a Rule 35(b) motion on his behalf. He also contended that its failure to file the motion constituted a breach of its contract with Friedland.

The court dismissed these claims for the same reasons that it dismissed the motion filed directly under Rule 35(b).  Friedland, 879 F. Supp. at 429.

The court then addressed Friedland's application under 28 U.S.C.  2241.  It rejected his claim that the severity level for his offense recognized by the Parole Commission was unjustified, as it was clear that the Pension Fund suffered a loss in excess of the threshold amount for that level.  The court also rejected Friedland's contention that the Parole Commission did not have good cause for exceeding its guidelines as required by 18 U.S.C.  4206(c) and set forth at length its reasons for this conclusion.  Furthermore, the court rejected Friedland's contention that United States v. Addonizio, 442 U.S. 178, 99 S.Ct. 2235, which held that the Parole Commission's determination did not have to be controlled by the district court's intentions regarding parole, was inapplicable in view of the abolition of the Parole Commission, which the Crime Control Act of 1984 had provided would be effective in 1992.

Finally, the court rejected Friedland's contention that he was entitled to an evidentiary hearing under 28 U.S.C.  2255. The court reasoned that, while an evidentiary hearing is required to resolve disputed facts, a hearing was not required in this case because, even under Friedland's view of the facts, he was not entitled to relief.  United States v. Day, 969 F.2d 39, 41-42 (3d Cir. 1992); United States v. Forte, 865 F.2d 59, 62 (3d Cir. 1989).  After the district court denied Friedland's motion for reconsideration, he filed this appeal.

## II. DISCUSSION

### 1. Old Rule 35(b)

It is clear that Friedland's motion under old Rule 35(b), applicable because Friedland committed the offense before the sentencing guidelines became effective, was untimely.  That rule required Friedland to make his motion within 120 days of sentencing.  Friedland did move for reduction of sentence within that period but the district court denied the motion and Friedland did not appeal from that denial.  Friedland's motion under old Rule 35(b), now before us, is literally years late, because he filed it after the Parole Commission rejected his application for parole.

We recognize that Friedland has characterized his new motion under Rule 35(b) as a "motion for reconsideration of reduction of sentence." Gov. app. 1.  But this ploy does not change the fact that the motion was untimely under old Rule 35(b).  As the district court noted, citing United States v. Addonizio, 442 U.S. at 189, 99 S.Ct. at 2242-43, the 120-day limit is jurisdictional, and cannot be extended.  Consequently, a defendant may not file an untimely motion for reduction of sentence and relate it back to a timely motion because treating the second motion as timely would frustrate the purpose of the time limitation in old Rule 35(b).  See United States v. Ferri,

686 F.2d 147, 154-55 (3d Cir. 1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1205 (1983); United States v. Dansker, 581 F.2d 69, 72 (3d Cir. 1978).

Friedland's use of old Rule 35(b) was a particularly blatant violation of the time constraint policy of the rule because in the motion he relied on his efforts to implement his "program" as a basis for a reduction of sentence. Of course, he did not even devise this "program" until after the expiration of the 120-day period for serving a motion to reduce sentence under old Rule 35(b). Furthermore, inasmuch as Friedland made his motion after the Parole Commission had rejected his application for parole, he used the motion for an improper purpose, i.e., as a substitute for the decision of the Parole Commission. SeeUnited States v. Idone, 38 F.3d 693, 696-97 (3d Cir. 1994).

2. New Rule 35(b) and 28 U.S.C.   2255

Friedland asserts that he reached an agreement with Longarzo in the summer of 1990 that, in return for information, Longarzo would help him obtain a shortening of his sentence and would assist him before the Parole Commission. Gov. app. 4. Friedland claims that the offices of the United States Attorneys for the Eastern and Southern Districts of New York ratified this understanding. Brief at 9. He asserts that he has a right predicated on contractual principles and due process of law to have these promises enforced. In his brief, he does not delineate clearly whether he is entitled to this relief directly under Rule 35(b) or under 28 U.S.C.   2255.

Friedland's contentions in this respect are bizarre. When new Rule 35(b) was adopted effective November 1, 1987, it provided that the court, "on motion of the Government, may within one year after the imposition of a sentence, lower a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense, in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code." Pub. L. No. 98-473,   215, 98 Stat. 1837, 2016 (1984); Pub. L. No. 99-570, 1009, 100 Stat. 3207, 3207-8 (1986). New Rule 35(b) was amended on April 30, 1991, with an effective date of December 1, 1991, to permit the court to "consider a government motion to reduce a sentence made one year or more after imposition of the sentence where the defendant's substantial assistance involves information or evidence not known by the defendant until one year or more after imposition of sentence."

As we have noted, the court sentenced Friedland on December 2, 1988. Thus, in the summer of 1990, when Friedland claims to have made his agreement with Longarzo, the government could not file a motion on his behalf under the original and then applicable version of new Rule 35(b) because the time for such a motion had expired. Nor could it file a motion on his behalf under the amended new Rule 35(b) as that amendment had not yet been adopted. Consequently, Friedland claims to have been

negotiating for assistance which as a matter of law could not have been given with respect to his sentence.

Notwithstanding this legal flaw in Friedland's argument, we have examined the voluminous documentation in the record and find nothing to support Friedland's contention that the government agreed to make a motion to reduce his sentence. But his assertion, which the government vigorously denies, even if true, gets him nowhere because it is perfectly clear that Friedland's dealings with assistant United States attorneys in the Eastern and Southern Districts of New York could not have included any such enforceable promise.

The office of the United States Attorney in New Jersey has taken the position without equivocation from the time of Alito's letter of April 3, 1989, that it would not negotiate with Friedland.  It maintains that position to this day.  Under 28 U.S.C.    541 and 547 the United States Attorney is responsible for the prosecution of all criminal cases within his or her district.  The United States Attorney for the District of New Jersey never was removed from or superseded in the Friedland prosecution.  Consequently, only the United States Attorney for the District of New Jersey could file a motion for reduction of sentence in Friedland's case under new Rule 35(b).  Thus, as a matter of law, Friedland could not have negotiated an agreement for the government to move to reduce his sentence.

Of course, Friedland knew that the United States Attorney for the District of New Jersey would not file such a motion.  Indeed, that knowledge led him to deal with Longarzo and the New York assistant United States attorneys.

It is significant that Friedland, though disbarred, had been an attorney admitted to practice in the state and federal courts in New Jersey.  Thus, he should have recognized that at a minimum there was a serious legal question as to whether the district court could reduce his sentence without a motion from the United States Attorney in New Jersey requesting it to do so. It is also significant that the record makes it clear that Friedland has been involved personally in the legal aspects of his case.  Indeed, when we pointed out to Friedland's attorney at oral argument that Friedland's brief twice referred to Friedland as "me," suggesting that Friedland had written the brief, the attorney acknowledged that Friedland had participated in the writing of the brief.  Thus, this case does not involve any government overreaching by taking advantage of an unsophisticated defendant.

We recognize that, in some situations, a United States Attorney can form agreements that are effective outside of his or her district.  United States v. Carter, 454 F.2d 426 (4th Cir. 1972), cert. denied, 417 U.S. 933, 94 S.Ct. 2646 (1974), on which Friedland relies, demonstrates this principle.  In Carter, on appeal from an order denying a motion to dismiss an indictment, the court held that an alleged promise made by the United States Attorney for the District of Columbia to a cooperating defendant who helped in the apprehension and conviction of other defendants, if made, would be binding on the United States Attorney for the Eastern District of Virginia.  But in Carter the

alleged promise was that the District of Columbia prosecution would be "the sole prosecution against defendant." Id. at 428. The agreement, if made, would have been binding with respect to a future prosecution in another district. Thus, the Carter court remanded the matter to the district court for an evidentiary hearing to determine if the government made the promise and, if so, whether the defendant relied on it.

Here the situation is different. The prosecution in New Jersey had been completed long before Friedland opened his negotiations with Longarzo and with the assistant United States attorneys in New York. We need not and will not determine how far a United States Attorney in one district may go in making agreements binding on other districts. Rather, we hold only that the United States Attorney in New Jersey had exercised such a degree of control over the Friedland prosecution and the prosecution had progressed so far that, without his or her consent, as a matter of law the United States Attorneys in the Eastern and Southern Districts of New York could not bind the government to make a motion to reduce Friedland's District of New Jersey sentence. Thus, notwithstanding Friedland's assertion that he had an agreement that the government would move to reduce his sentence, on the basis of the undisputed facts that the United States Attorney in New Jersey neither made nor consented to any such agreement, and from shortly after Friedland's sentencing told him it would make no promises to him and has adhered consistently with that position, the district court properly denied Friedland relief under new Rule 35(b) and under 28 U.S.C.  2255.

3. Parole and section 2241
    a. Addonizio and Salerno
        Friedland does make an interesting technical argument involving the interplay between United States v. Salerno, 538 F.2d 1005 (3d Cir. 1976), and United States v. Addonizio, 442 U.S. 178, 99 S.Ct. 2235. (1979)  In Salerno, we ordered a resentencing in a post-conviction proceeding under 28 U.S.C. 2255 when the defendant was not paroled within the period contemplated by the sentencing judge.  In Addonizio, however, the Supreme Court held that the district court did not have jurisdiction under section 2255 to reduce a sentence merely because the Parole Commission prolonged the defendant's period of incarceration beyond the time contemplated by the district court. The Court emphasized that, in general, Congress provided that the Parole Commission, and not the sentencing court, would determine when a lawfully sentenced defendant would be released.  Id. at 188-89, 99 S.Ct. at 2242.  In this case, the district court thought that Friedland would be paroled between 40 and 52 months after his incarceration.

        Friedland seeks to have Salerno applied here based on the following reasoning.  The court sentenced Friedland on December 2, 1988.  At that time, the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473,  235(a)(1) and (b)(1), 98 Stat. 1837, 2031-33 (1984), provided for abolition of the Parole Commission on November 1, 1992.  Thus, Friedland argues that

after November 1, 1992,

> the Court, not the Parole Commission, would
> exercise parole supervision jurisdiction.
> Thus, Judge Gerry [the sentencing judge who
> has since died] had enforceable parole
> expectations because after November 1, 1992,
> according to the law in existence when he
> sentenced Friedland, the Court and not the
> Parole Commission would supervise Friedland's
> parole.  Since Judge Gerry recommended on
> Form A0235 that Friedland be paroled within
> his Guideline range of 40-52 months, it is
> reasonable to assume that he would follow his
> own recommendation.

Brief at 38-39.

Friedland acknowledges that section 235(b)(3) of the
Comprehensive Crime Control Act of 1984 obliged the Parole
Commission to set a release date for an individual who would be
in its jurisdiction the day before its scheduled abolition.  He
further recognizes that the Parole Commission may depart from the
parole guidelines.  But he reasons that under section 235(b)(4)
"responsibility for parole supervision and revocation [is
transferred] to U.S. District Judges."  Brief at 39.  Thus, in
Friedland's view, when Judge Gerry sentenced him, the judge must
have contemplated that if the Parole Commission rejected his
parole application, a district judge could review his case 24
months later.  18 U.S.C.  4208(h)(2).  While Friedland realizes
that Congress has extended the Parole Commission's life by five
years to 1997, see Pub. L. No. 101-650,  316, 104 Stat. 5089,
5115 (1990), he believes that his hypothetical reconstruction of
what would have happened if the Commission's life had not been
extended should lead to his release because the two-year review
period would have expired no later than two years after the
original date for the abolition of the Commission in 1992.

We reject Friedland's argument for several reasons.
First, the Parole Commission has not been abolished.  Second, it
is by no means clear that Congress ever intended to authorize a
district court to grant parole.  Section 235(b)(4) of the
Comprehensive Crime Control Act of 1984 provides "that the
district court shall determine, in accord with the Federal Rules
of Criminal Procedure, whether release should be revoked or the
conditions of release amended for violation of a condition of
release."  This provision says nothing about granting parole.
Third, it is speculative to attempt to ascertain what a district
court would have done with respect to parole, assuming that it
had the power to grant parole, if Congress had not extended the
life of the Parole Commission.  Perhaps the same arguments that
convinced the Parole Commission to deny parole would have
convinced a district judge to reach the same conclusion.  In this
regard we observe that we see no reason why a judge passing on a
parole application would be any more bound by a sentencing
judge's expectation of when the defendant would be paroled than

the Parole Commission itself after Addonizio.


        b. Abuse of discretion

        Friedland next contends that: (1) the Parole
Commission's decision denying him parole was arbitrary; (2) the
Commission did not consider the factors it should have taken into
account in making its decision; (3) the record does not support a
conclusion that he was a poor parole risk, and (4) the Commission
relied on a false assessment of his crimes in reaching its
conclusion.  He points out that he had excellent work reports,
no incident reports, received bonuses for job performance,
volunteered for service on the suicide watch, had an excellent
institutional adjustment and received positive evaluations while
incarcerated.  He also notes that Judge Gerry recommended that he
be paroled after service of the parole guideline range of 40 to
52 months and that his co-defendants were paroled after two years
of imprisonment.
        Our review of the district court's order denying
Friedland relief under 28 U.S.C.  2241 is plenary.  United
States ex rel. Schiano v. Luther, 954 F.2d 910, 912 (3d Cir.
1992).  In contrast, we cannot disturb the Parole Commission's
ruling unless it acted arbitrarily or capriciously or abused its
discretion in reaching its result.  Bridge v. United States
Parole Comm'n, 981 F.2d 97, 105 (3d Cir. 1992).  In exercising a
deferential standard of review we recognize that although
Friedland's parole guideline range was 40 to 52 months, the
parole guidelines do not have the conclusive force of the
sentencing guidelines.  Thus, 18 U.S.C.  4206(c) provides that
the Commission may "deny release on parole notwithstanding the
guidelines . . . if it determines there is good cause for so
doing."  See Campbell v. United States Parole Comm'n, 704 F.2d
106, 111 (3d Cir. 1983).  This rather nonspecific standard
differs materially from the more exacting criteria for departure
from the sentencing ranges established under the sentencing
guidelines.
        Our task, then, is to determine whether we can say that
the Parole Commission abused its discretion in determining that
there was good cause for denying Friedland parole.  In this
regard, we note that release may be denied if it would
"depreciate the seriousness of [the] offense or promote
disrespect for the law."  18 U.S.C.  4206(a)(1).  The facts show
that Friedland engaged in his second crime activity while he was
on bond after his original convictions; this second crime took
place over an extended time period while Friedland pretended to
cooperate with the government; Friedland evaded income taxes; and
his crime caused a multi-million dollar loss.  Friedland also
mocked the criminal justice system by faking his own death and
remaining a globe-trotting fugitive.  In the circumstances, his
release would depreciate the seriousness of the crime.
        We recognize that Friedland's institutional conduct
superficially supports his application for parole.  Yet in some
respects that very conduct is disturbing.  After his initial

convictions he manipulated the government so that he could stay out of prison and commit a further crime. He then faked his own death in an attempt to avoid apprehension. Friedland's conduct in prison, the procuring of information from other inmates for his own benefit, is consistent with his prior manipulative conduct. Furthermore, his efforts to circumvent the authority of the United States Attorney in New Jersey demonstrate that his manipulative character has not changed. By any standard Friedland, though undoubtedly highly intelligent, is a cunning, manipulative individual, scornful of society's constraints.

Furthermore, while it is true that in a conventional sense, i.e., the causing vel non of management problems in prison, Friedland is not a problem prisoner, it hardly would be expected that a person with his background would present a discipline problem. Overall, we think that the Commission was justified in concluding that Friedland was "a poorer risk than indicated by [his] salient factor score."

Friedland also attacks the predictive abilities of the Parole Commission, pointing out that "statistics on parole violators show how often the parole commission's decisions are wrong." Brief at 31. No doubt this statement is correct because paroled convicts do commit further crimes. Yet this unfortunate fact is hardly a reason to upset a Parole Commission determination that a person should not be paroled in part because he is a poor risk. If Friedland's history teaches us anything, it is that when not in custody he is dangerous. After all, when he remained at liberty after his first convictions he was in a position analogous to that of a convict on parole. Like a convict on parole, he was subject to some control under the criminal justice system but yet was not in physical custody. We know what he did then, and we cannot fault the Parole Commission for wanting to avoid repetition of that conduct. Friedland's institutional record in no way detracts from the Commission's conclusions.

## 4. The request for an evidentiary hearing

Friedland finally argues that the court erred in denying him an evidentiary hearing. We see no basis for this argument, as the undisputed facts show that he was not entitled to relief. Government of Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989). As we have explained, it is beyond dispute that his motion for reduction of sentence under old Rule 35(b) was not timely. As a matter of law, he also was not entitled to relief under new Rule 35(b) or 28 U.S.C. 2255. Finally, the fact that Friedland engaged in additional serious criminal conduct after his first convictions, and then faked his death and fled to avoid apprehension cannot be disputed, so it is clear that the Parole Commission did not abuse its discretion in denying him parole. In the circumstances, there was no reason for the district court to conduct an evidentiary hearing.

### III. CONCLUSION
For the foregoing reasons we will affirm the district

court's orders of March 2, 1995, and August 3, 1995.


United States of America v. David Friedland
No. 95-5582/5583/5584

ROSENN, Circuit Judge, concurring and dissenting.

I concur in the majority's holding that the district court properly denied Friedland relief under his motions pursuant to 28 U.S.C.  2255 and both versions of Fed. R. Crim. Proc. 35. I believe, however, that the Parole Commission did not fully consider Friedland's case for parole, gave no valid reasons for an upward departure from its guidelines, and, thus, abused its discretion.  I therefore must respectfully dissent from that portion of the majority's opinion dealing with that issue, particularly Part II (3).

Then-Chief Judge John Gerry, an able and experienced trial judge of the United States District Court for the District of New Jersey, sentenced Friedland.  Judge Gerry imposed a sentence which he believed would adequately reflect the seriousness of Friedland's offenses, punish Friedland, and permit his rehabilitation.  With the facts before him of all of Friedland's offenses, including his conduct in leading the United States Attorney's office for the District of New Jersey to believe that he would cooperate and instead committing another offense, and his flight while on bail, Judge Gerry imposed a sentence which would allow for parole eligibility after a period of 40 to 52 months of incarceration.  Friedland has, as of March 25, 1996, served 100 months.

I recognize, as the majority notes, that the presumptive parole date set by Judge Gerry does not have the force of law.  Nor do I see merit in Friedland's procedural argument that the imminent dismantlement of the Parole Commission requires a return to this court's rule in United States v. Salerno, 538 F.2d 1005 (3d Cir. 1976).  Because the Parole Commission is still in existence, the Supreme Court's rule set in United States v. Addonizio, 442 U.S. 178 (1979) still applies. Thus, I agree that the Parole Commission's departure from the parole date target set by Judge Gerry does not give the courts authority to reduce his sentence.  The Commission may disregard the guidelines if there is good cause for so doing. See, 18 U.S.C.  4206(c).

Nonetheless, if the Parole Commission wishes to exercise its power to, in effect, overrule Judge Gerry's and the defendant's parole expectations, and disregard the recommendation of the Commission's interviewing panel in this case, it cannot do so arbitrarily and capriciously.

The reasons cited by the Commission lack substance. They rely solely on facts considered by the sentencing judge when he fixed the sentence;  the extended period of the fraud, the aborted cooperation, the flight, and the misconceived amount of loss.  The Commission cited no factors that the trial judge had not properly taken into account in setting the sentence.  His initial sentence was 7 years; his final sentence, in light of the

second fraudulent offense and the factors now assigned by the Commission, was 15 years, 11 months, and 6 days.  Reiteration of these reasons, therefore, cannot constitute "good cause" for denying Friedland any parole at all.

The majority points out that 18 U.S.C.  4206(a)(1) authorizes a denial of parole if it may "depreciate the seriousness of offense or promote disrespect for the law."  It is this statute which the United States Attorney relied upon in urging the Commissioners to deny Friedland parole.  Friedland's offenses were serious, but he has served more than twice the sentencing judge's expectation in punishment for offenses that involved no violence, no assault upon any person, no drugs, no organized crime.  Instead of pointing to material factors that the sentencing judge may have disregarded or ignored, the Commission trumps the sentence of the judge by its own views of what the sentence should have been.  And it does so in total disregard of the appellant's exemplary prison record and of its own panel's recommendation that the prisoner be granted "a presumptive parole after service of 84 months provided the committed fine is paid or otherwise deposed of according to law." This suggested presumptive parole date even includes an extra 20 months of confinement above the guidelines because of the Commission of the second offense "while subject was on bond on the first."

The Commission's speculation that parole would depreciate the seriousness of the offense and promote disrespect for the law is a conclusory statement.  It has no facts to support it and relies on similar conclusory statements of the prosecuting attorney and the Department of Labor Special Agent. No personal victim opposes the parole; the appellant has done nothing since his incarceration that remotely suggests any misconduct or further disregard for the law on his part.  On the contrary, to the extent permitted, he has attempted to assist the Government in enforcing the law against those engaged in crime. From time to time, he has been helpful.  In the meantime, numerous white-collar criminals, some with offenses much more far-reaching and with offenses on a greater scale than this applicant, have been paroled after serving two to five years of their sentences.  This includes Friedland's own co-defendants, who, as fiduciaries of the Teamster's pension fund, were in as great or a greater position of trust than Friedland when they participated in the fraud.

In considering the prisoner's application for parole, it seems to me that sound reasons, as well as the Commission regulations, suggest that the Commission focus on the applicant's conduct since he began the service of his sentence, not his behavior that brought him into conflict with the law.  The purpose of penal punishment is not only to deter crimes but also rehabilitate.  Regulations of the Parole Commission require it to consider any reasonable information concerning the prisoner. 29 C.F.R. 2.19-04(a).  The Commission may even consider an advancement of the presumptive release date for (1) superior program achievement over a period of 9 months in custody, pursuant to the provisions of 28 C.F.R. 2.60 and/or assistance in

the prosecution of other offenders pursuant to 28 C.F.R. 2.63. Friedland has provided both.

Friedland's institutional record demonstrates an excellent adjustment, a sincere respect for law and order. In addition to the positive reports and volunteer activities noted by the majority, Friedland also participated in the financial responsibility program to make restitution. He wrote a letter to the Parole Commission that shows his remorse and understanding of the seriousness of his crime. Every person who had personal contact with Friedland, from psychologists to the original panel of parole examiners, found him to be a candidate for parole. The Commission, however, has ignored completely any factor favorable in Friedland's behavior since his incarceration.

I also note in passing the extreme unlikeliness of recidivism in this case. Friedland's crime was not one of violence, nor does he have a violent character. Rather, he perpetrated a fraud made possible by a conflation of circumstances that are unlikely ever to happen again. He is now sixty years of age. He has been dismissed as counsel for Teamster Local No.701, the victim of the fraud. He has been publicly humiliated and imprisoned. It is highly unlikely that he will hold a position of trust again. Besides, if paroled, he would be on probation and strict supervision. This is obviously a time for healing, not vindictiveness on the part of the prosecution. Besides, parole is only a conditional release, it is a modified continuation of punishment, and the parolee is under supervision and subject to return to prison for any infraction.

Moreover, the procedure used by the Commission in deciding this case is questionable. A two-person panel of parole examiners originally conducted a hearing in this case at which Friedland appeared arguing for parole and two representatives of the United States Attorney's office in New Jersey and the United States Department of Labor appeared in opposition of parole. The panel had an opportunity not only to study the record, the offenses and sentencing, but also to weigh the positions of the subject and the Government. The two members of the panel were the only persons in the Commission to meet personally with both Friedland and the Government representatives opposing his parole. Paul C. Kurtz of the National Correctional Counseling Center in Washington, D.C., speaking in behalf of Friedland, urged parole at the time in accordance with the parole guidelines. Kurtz did not believe it would depreciate the seriousness of the offense if the subject were paroled because this case did not differ from any other high profile fraud case, including Ivan Boesky, Jim Bakker or Michael Milliken. Counsel for Friedland observed at the hearing that there was no publicity in the case but only manifestations of political rancor from the Office of the United States Attorney for the District of New Jersey. The panel noted: "This was evident because subject has attempted to cooperate on numerous occasions but this had not been encouraged by that office."

Under Parole Commission procedures, it is usual for the panel's decision to be reviewed by the Regional Commissioner. In

this case, Friedland's application was appropriately designated as one for original jurisdiction. This means that the Regional Commissioner, after reviewing the decision of the panel and making his own recommendation, sends the case to the National Parole Commission for final review. Its decision is the final one. Friedland did not have the opportunity to appear before either the Regional Commissioner or the National Commissioners.

Applicants for parole do not have a right to personal appearances before review boards. See, e.g., Billiteri v. Board of Parole, 541 F.2d 938 (2d Cir. 1976). Therefore, review boards should be particularly deferential to the findings and recommendations of the interviewing panel, presumably professionals, who weighed the merits of the presentations made in behalf of and in opposition to parole at that time. The panel found:

> "It is the panel's finding's that subject should be paroled because the sentencing judge has no objection, but on the contrary, recommends parole in accordance with the parole guidelines. In making its determination as to when subject should be paroled, the panel believes that the negative information provided by the representatives of the government is off-set by the favorable factors regarding subject which includes his cooperation and his institutional adjustment."

As an appellate court, we have many times recognized that the district courts which we review are in much better positions to judge such matters as the credibility, demeanor of witnesses, the harm of an evidentiary error, and the weight of the evidence. We recognize that our review of a dry record, of necessity, cannot be as comprehensive as the review of the judge who watched and heard the issues being played out. The Regional Commissioner and the National Commissioners here should exercise the same appellate restraint. They are not in a position to make credibility judgments, but rather should defer to those of the panel. Their review should by no means be a rubber-stamp of the panel decision, any more than appellate review rubber-stamps district court decisions. Nonetheless, like appellate courts, the Commissioners should specifically note where the panel committed error if they wish to overrule its recommendation.

The Commissioners, all political appointees, did not do this in Friedland's application. The Regional Commissioner, in his memorandum, merely details the facts of Friedland's pre-incarceration offenses, and concludes: "The aggravating factors of subject's [pre-sentence] behavior outweighs his cooperation and institutional adjustment significantly." This conclusory statement does not explain why the same aspects of Friedland's behavior, which were taken into account by both Judge Gerry and by the panel examiners, merited more confinement than any of them had found appropriate. The National Commissioners adopted the Regional Commissioner's recommendation. Neither review board

disputed, or even mentioned, the carefully weighed factual findings and the conclusions made by the panel at its hearing of Friedland on March 10, 1993, regarding his institutional adjustment, his remorse, or his ability to function in society. Just as appellate courts cannot reject out-of-hand the factual findings of trial courts, the Commissioners should not be able blithely to ignore those of the panel examiners who actually conducted a hearing on Friedland's application for parole.

These procedures do not show proper deference to the panel finders of fact. Also, the Parole Commission usurped judicial power by departing from the parole guidelines solely for reasons already considered by Judge Gerry. Moreover, the Commission does not point to any fact that justifies the outright denial of any parole.

I therefore believe that the Parole Commission abused its discretion in rejecting Friedland's application. In turn, the district court perpetuated the conclusory action of the National Commission. Hence, I respectfully dissent. Accordingly, I would vacate the judgment of the district court with directions to remand the case to the Parole Commission with instructions to consider with proper deference the findings of the hearing panel  and for such further proceedings as are consistent with this opinion.